184 S.E.2d 94 (1971)
STATE of West Virginia ex rel. The STATE BUILDING COMMISSION of West Virginia
v.
The Honorable Arch A. MOORE, Jr., Governor of the State of West Virginia, as Chairman of the State Building Commission of West Virginia, and the Honorable John D. Rockefeller, IV, Secretary of State of the State of West Virginia, as Secretary of the State Building Commission of West Virginia.
No. 13093.
Supreme Court of Appeals of West Virginia.
Submitted July 28, 1971.
Decided October 5, 1971.
*96 Jackson, Kelly, Holt & O'Farrell, F. Paul Chambers, James K. Brown, Charleston, for relator.
Chauncey H. Browning, Jr., Atty. Gen., Cletus B. Hanley, Deputy Atty. Gen., Victor A. Barone, Asst. Atty. Gen., Charleston, for respondents.
Leo Catsonis, Charleston, for intervenors.
*95 CALHOUN, Judge:
This case involves a proceeding in mandamus instituted in this Court by The State of West Virginia at the relation of The State Building Commission of West Virginia against The Honorable Arch A. Moore, Jr., Governor of the State of West Virginia, as Chairman of The State Building Commission of West Virginia and The Honorable John D. Rockefeller, IV, Secretary of State of the State of West Virginia in his capacity as Secretary of The State Building Commission of West Virginia, as respondents.
In the interest of convenience and brevity, The State Building Commission of West Virginia may be referred to hereafter in this opinion as the Building Commission.
The basic purpose of the mandamus proceeding is to require the two respondents in their official capacities as chairman and secretary, respectively, of the Building Commission to perform certain acts, which are alleged to be nondiscretionary legal duties, in order to enable the Building Commission fully to effectuate and complete its purpose of issuing and selling certain "state building revenue bonds of the state" in order to finance the construction of certain state buildings and related facilities. The majority of the buildings have been constructed and are now occupied by various *97 departments and agencies of state government.
More specifically, the purpose of the mandamus proceeding is to obtain an adjudication by this Court of the question of the legal validity of the actions of the Building Commission in relation to the issuance and sale or proposed issuance and sale of bonds and the construction or proposed construction of buildings and related facilities. This, in turn, involves basically the question of the constitutionality of portions of Chapter 167, Acts of the Legislature, Regular Session, 1971, when considered in the light of this Court's decision in State ex rel. Hall v. Taylor, W.Va., 178 S.E.2d 48, by which the Court held that Article 6 of Chapter 5, Code, 1931, as amended in 1968, was unconstitutional in part in that it created a state debt in violation of Section 4 of Article X of the Constitution of West Virginia, the most pertinent portion of which constitutional provision is as follows: "No debt shall be contracted by this State, except to meet casual deficits in the revenue, * * *." The Court's decision in the Hall case is summarized in the second point of the syllabus as follows:
"To the extent that Article 6 of Chapter 5, Code, 1931, as amended and reencated in part by Chapter 10, Acts of the Legislature, Regular Session, 1968, authorizes the issuance and sale of `revenue bonds' for the construction of state buildings and contemplates that the principal of and the interest on the bonds shall be paid solely from a fund to be created and maintained from general revenue appropriations to be made by the legislature from year to year for payment of rent for the use and occupancy of such buildings by various state departments and agencies as lessees of office space in the buildings so constructed, the statute creates a state debt in violation of the inhibitory provisions of Section 4 of Article X of the Constitution of West Virginia. In this respect and to this extent, therefore, the statute is unconstitutional and accordingly the `fund' which the statute undertakes to create as a source of payment of the bonds has no valid, constitutional existence." (Italics supplied.)
The 1971 enactment in question, designated as Enrolled House Bill No. 944, which hereafter in this opinion may be referred to merely as the 1971 Act, amended and reenacted the provisions of Article 6 of Chapter 5, Code, 1931, as amended in 1968; and also amended and reenacted Sections 9a and 19a of Article 3 of Chapter 60, Code, 1931, as previously amended. The basic purpose of the 1971 Act, as expressed therein, is to avoid, correct or obviate the constitutional infirmities of Article 6 of Chapter 5, Code, 1931, as amended, in the light of this Court's decision in State ex rel. Hall v. Taylor, W.Va., 178 S.E.2d 48, which may be referred to hereafter in this opinion merely as the Hall case. Reference is here made to the opinion in that case for the discussion therein of certain statutes, facts and prior decisions of this Court which form a part of the background of the present case.
After the present mandamus proceeding was pending in this Court, Rabbi Samuel Cooper, Dan Straight, Paul J. Whittington, Michael Callias, Harry Gidley, Neil Robinson, James Ferrise, Ruth Maley, Dewey Barker, Robert Barker and Woodrow Hunsinger, as interested citizens, taxpayers and property owners, presented to the Court their petition by which they sought to intervene as additional parties respondent in the mandamus proceeding in opposition to the relief sought by the Building Commission. The prayer of the petition to intervene was granted and accordingly the petitioners were permitted to intervene in the case as additional parties respondent. They may be referred to hereafter in this opinion as the intervening respondents.
The present case was submitted for decision by this Court upon the mandamus petition; upon the demurrer to the mandamus petition filed by and in behalf of the two original respondents; upon the answer and *98 the demurrer to the mandamus petition filed by and in behalf of the intervening respondents; upon the demurrer of the Building Commission to the answer of the intervening respondents; and upon briefs and oral arguments of counsel for all parties. A decision of the case does not involve any material factual issue.
The 1971 Act creates a special fund or account to be kept, maintained and disbursed by the state treasurer for the payment of rent for state buildings or portions thereof leased to, occupied and used by various divisions, agencies or departments of state government and provides that such rent may be paid from moneys to be paid into the fund for that purpose at the rate of $3,600,000 annually. The 1971 Act provides that this annual payment of $3,600,000 be made by the West Virginia Alcohol Beverage Control Commissioner from profits accruing from the sale of alcoholic liquors pursuant to statutes which create a state monopoly for the sale thereof. It is contemplated by the Building Commission that the cost of the rent, maintenance and upkeep of State Office Building Number 5, leased by the Building Commission to the West Virginia Department of Highways for its sole occupancy and use, may be paid from the State Road Fund created by Section 52 of Article VI of the Constitution of West Virginia.
The major questions presented for decision involve a determination whether the payment of rents by the State Department of Highways from the State Road Fund and the payment of rents by various agencies and departments of state government from a fund to be created and maintained largely from a portion of the profits arising from the sale of alcoholic liquors by the state would unconstitutionally create state debts in violation of the provisions of Section 4 of Article X of the Constitution of West Virginia, being the same constitutional provision which was held in the Hall case to have been violated.
By both the 1968 amendment and reenactment of Article 6 of Chapter 5 of Code, 1931, as amended, and by the amendment and reenactment thereof by the 1971 Act, the legislature has clothed the Building Commission with broad powers and extensive authority to provide for the construction of buildings and related facilities for use and occupancy by the various agencies and departments of the state government and to finance the cost of the construction of such buildings and incidental facilities by the issuance and sale of "state building revenue bonds of the state" in conformity with all pertinent constitutional and statutory provisions.
In 1950, the Building Commission, then designated by statute as the State Office Building Commission, issued bonds in the amount of $1,700,000, pursuant to statutory authorization, for the construction of a state office building, designated as Building Number 4, which is located at the corner of California Avenue and Washington Street, in the City of Charleston, to house state agencies supported in whole or in part from federal funds or state agencies supported by special funds. The present occupants of the building are the West Virginia Workmen's Compensation Commission and the Department of Employment Security. The two occupants pay monthly rentals which are applied to the payment and discharge of the bonds. These rental funds are not derived from taxation by the state or from general revenue appropriations made by the legislature. The question of the validity of these bonds is not before the Court for decision in this case.
By a resolution adopted on March 11, 1968, the Building Commission authorized the issuance of "State Building Revenue Bonds, Series 1968," which were dated April 1, 1968, for buildings which, pursuant to the State Capitol Master Plan, were numbered 5, 6 and 7, respectively. It was this series of bonds which was involved in the Hall case, in which, as we have stated previously, the Court held the pertinent statute to be unconstitutional in part. The construction of these buildings has been completed and they are now occupied by *99 various agencies and departments of state government. Office Building Number 5 is leased to and is occupied and used wholly and exclusively by the West Virginia Department of Highways.
On October 14, 1968, the Building Commission adopted a resolution authorizing the issuance of "State Building Revenue Bonds, Public Safety Series" in the principal sum of $2,500,000 for the purpose of constructing a project consisting of a headquarters building at South Charleston, West Virginia, for the Department of Public Safety of West Virginia and a barracks building in connection with the State Police Academy at Institute, West Virginia. These buildings have been constructed and are now occupied and being used for the purpose for which they were constructed.
On April 13, 1970, the Building Commission adopted a resolution authorizing the issuance of "State Building Revenue Bonds, Science and Culture Center Series," in the principal amount of $9,000,000 for the purpose of constructing a project providing for a center for science and culture, including an archives and history building and other office space, parking and other incidental facilities.
All the bonds have been sold except that only $1,500,000 temporary bonds of the $9,000,000 "Science and Culture Center Series" bonds have been sold; and all buildings have been constructed and are now occupied and being used, except that construction of the Science and Culture Center has not proceeded beyond acquisition by the Building Commission of certain private property for that purpose from the proceeds of the sale of the temporary bonds in the principal amount of $1,500,000.
Section 1 of the 1971 Act provides that The State Building Commission of West Virginia shall continue as a body corporate and as an agency of the State of West Virginia; that it shall consist of the governor, who shall be chairman, and four additional members to be appointed by the governor by and with the advice and consent of the senate; and that the "secretary of state shall be a member of the commission and serve as secretary, but shall not have the right to vote upon matters before the commission."
By Section 2 of the 1971 Act, the legislature found that the proceeds from the sale of the "State Building Revenue Bonds, Series 1968," the "State Building Revenue Bonds, Public Safety Series" and the "State Building Revenue Bonds, Science and Cultural Center Series" have been expended or obligated in and for the construction of or in connection with projects "pursuant to this article," which projects are owned and held in the name of the state or of the Building Commission; that the acquisition and construction of the projects have been in the best interests of the state by providing additional office space and other related structures which are needed for the use of the state; that this Court has held that the provisions of the statute as amended in 1968 "were unconstitutional to the extent that the same contemplated that the principal of and the interest on bonds issued by the commission would be paid solely from a fund to be created and maintained from general tax revenues of the State"; and that the 1971 "amendments made by this act to this article are intended (1) to modify the provisions of this article so as to cause the same to be in full compliance with the provisions of the Constitution of the state of West Virginia, which said court held were violated by the former provisions of this article, and to be in full compliance with said decision of the supreme court of appeals of West Virginia, and (2) to accord statutory recognition to existing rights, legal and equitable, of the holders of bonds heretofore issued by the commission, afford security for the payment of the obligations evidenced thereby and provide a special fund for the payment of the obligations evidenced thereby."
Section 3(5) provides that "General tax revenues of the state" means revenues of the state derived from the exercise of the power of taxation and available for appropriation *100 by the legislature for general public purposes and shall not include revenues of the state, or of any officer, department or agency thereof, derived from taxes levied, collected and dedicated for a special purpose or purposes or derived from sources other than taxes, such as profits, fees or charges.
Section 5 contains the following language:
"All moneys of the commission from whatever source derived shall be paid to the treasurer of the state of West Virginia, who shall not commingle said moneys with any other moneys, but shall deposit them in a separate bank account or accounts. The moneys in said accounts shall be impressed with and subject to the lien or liens thereon in favor of the bondholders provided in the proceedings for issuance of bonds pursuant to this article. The moneys in said accounts shall be paid out on check of the treasurer on requisition of the chairman of the commission, or of such other person as the commission may authorize to make such requisition. * * *."
Section 8 contains the following language:
"* * * All such bonds shall have and are hereby declared to have all the qualities of negotiable instruments. * * * The commission shall determine the form of such bonds, including coupons to be attached thereto to evidence the right of interest payments, which bonds shall be signed by the chairman and secretary of the commission, under the great seal of the State, attested by the secretary of state, and the coupons attached thereto shall bear the facsimile signature of said chairman of the commission. * * * If the proceeds of bonds issued for a project shall exceed the cost thereof, the surplus shall be paid into the fund hereinafter provided for payment of the principal and interest of such bonds. * * * Prior to the preparation of definitive bonds, the commission may, under like restrictions, issue temporary bonds with or without coupons, exchangeable for definitive bonds upon the issuance of the latter. * * * No bonds or other obligations shall be issued or incurred hereunder, unless and until the legislature by concurrent resolution has approved the purpose and amount of each separate project."
Section 12 is as follows:
"Nothing in this article contained shall be so construed or interpreted as to authorize or permit the incurring of state debt of any kind or nature as contemplated by the provisions of the Constitution of the State of West Virginia in relation to state debt."
Section 14 provides:
"This article, being necessary for the health, welfare and convenience of the citizens of the State, should be liberally construed to effectuate the purposes thereof."
Section 15 provides, in comprehensive terms, that if any portion or provision of the statute is held to be unconstitutional, such unconstitutionality or invalidity shall not affect any other portion or provision thereof "and to this end the provisions of this article are declared to be severable."
As a part of the plan for avoiding the partial unconstitutionality of Article 6 of Chapter 5, Code, 1931, as amended, in the light of this Court's decision in the Hall case, the legislature, by the enactment of Chapter 167, Acts of the Legislature, 1971, also amended Section 9a and Section 19a of Article 3 of Chapter 60, Code, 1931, as amended. Chapter 60 relates to the state control of alcoholic liquors. Sections 9a and 19a of Article 3 relate, in part, to the payment of Korean Veterans' Bonus Bonds from profits derived from the sale of alcoholic liquors. Apparently profits from the sale of alcoholic liquors have produced a surplus which is more than sufficient to pay the Korean Veterans' Bonus Bonds and the purpose of the amendment made by *101 the 1971 Act is to divert a portion of that surplus to the payment of the "State Building Revenue Bonds" which are involved in the present case.
Code, 1931, 60-3-9a, as amended, provides, in part, that the Alcohol Beverage Control Commissioner is directed to increase the price of alcoholic liquors. Thereafter, by the 1971 Act, the following language was added to that section by amendment:
"* * * then the commissioner is hereby directed to continue in effect the aforesaid price increase of alcoholic liquors and further increase the same as necessary for such continued increase together with such further increase to equal an amount sufficient to provide revenue of three million six hundred thousand dollars on an annual volume of business equal to the average for the last three years for the purpose of providing revenue to be paid into a special fund hereby created in the office of the state treasurer for the purpose of the payment of principal and interest on bonds of the state known as the `State Building Revenue Bonds', and for which payment, to the extent that the state building commission of West Virginia has available space in buildings operated by it in excess of revenue-producing uses, said commission shall provide at its established rates and charges such available excess space for use by such officers, departments or agencies of the state as the commissioner of finance and administration, or such other officer, agency or department as shall from time to time have the duty to arrange for office space for officers, departments or agencies of the state, shall specify. Whenever in any fiscal year the amount of money accumulated in the special fund for the retirement of said `State Building Revenue Bonds' shall be sufficient to pay at maturity all outstanding bonds together with the interest due or payable thereon, the provision herein made for continuing in effect the aforesaid price increase and the provision herein for a further price increase shall become ineffective at the end of such fiscal year."
Code, 1931, 60-3-19a, as amended, relating to payment of Korean Veterans' Bonus Bonds from profits from the sale of alcoholic liquor, contains the following sentence: "Whenever, in any fiscal year, the amount of money accumulated in the veterans' bonus sinking fund for the retirement of said Korean veterans' bonus bonds shall be sufficient to pay at maturity all outstanding bonus bonds issued under the `Korean Veterans' Bonus Amendment' of one thousand nine hundred fifty-six, together with interest due or payable thereon, no further transfers to such sinking fund shall be made after the end of such fiscal year." Immediately thereafter the following provision was added as an amendment by the 1971 Act:
"* * * Thereafter, from receipts in excess of the requirements of the operating fund of the commissioner, the sum of nine hundred thousand dollars shall be paid by the commissioner each quarter into the special fund created in section nine-a of this article for the purpose of retiring bonds of the State known as the `State Building Revenue Bonds.' It shall be the duty and responsibility of the state treasurer to pay the principal and interest on said bonds as they become due and payable. Whenever, in any fiscal year, the amount of money accumulated in the special fund for the retirement of said `State Building Revenue Bonds' is sufficient to pay at maturity all of the outstanding bonds, together with interest due or payable thereon, no further transfers to such special fund shall be made after the end of such fiscal year. Nothing in section nine-a of this article or in this section nineteen-a contained shall be taken as limiting the power and authority of the legislature to at any time appropriate the aforesaid receipts for some other purpose or make other direction or provision respecting such receipts."
*102 Following the action of the legislature in enacting the 1971 Act at its regular session, the Building Commission met on May 17, 1971, and adopted a new resolution authorizing the issuance of $9,000,000 in state building revenue bonds for the purpose of completing the Science and Culture Center project and funding the temporary bonds previously issued in the amount of $1,500,000, which were in default at that time. At the same meeting, the Building Commission adopted certain other resolutions relating to the payment of the principal and interest on the $24,200,000 "State Building Revenue Bonds, Series 1968," the $2,500,000 "State Building Revenue Bonds, Public Safety Series," and the interest on the $1,500,000 in temporary "State Building Revenue Bonds, Science and Culture Center Building."
Thereafter, Governor Moore addressed a letter to the Building Commission stating that he was not willing to publish any notice soliciting bids for the $9,000,000 State Building Revenue Bonds, Science and Culture Series, or any other bonds of the Building Commission or to take any other action ordered by the Building Commission respecting State Building Revenue Bonds until a court of competent jurisdiction has finally determined certain questions, which he is advised constitute serious questions concerning the validity and security for any and all of such bonds even under the 1971 Act. The questions thus posed by Governor Moore may be summarized as follows:
1. Inasmuch as profits from the sale of liquor could be made available for general revenue purposes, the bonds may still be subject to "the constitutional infirmities held by the court to be present in the pertinent statutes" before the enactment of House Enrolled Bill No. 944.
2. Inasmuch as the State Road Fund is composed of excise taxes, though it is a "constitutional fund", it may, nevertheless, "be subject to the same limitations respecting obligation thereof to pay debt as are general tax revenues of the state."
3. The provisions of the 1971 Act which would permit the Building Commission to require occupants of the buildings to provide for the operation and maintenance thereof might be held indirectly to `violate limitations held by the court in the Hall case to be applicable respecting the obligation of general tax revenues of the state."
4. The requirement that "interest be paid at the legal rate on the overdue interest coupons of the $1,500,000 State Building Revenue Bonds, Science and Culture Center Series (Temporary Bonds)," may violate the immunity of the state from payment of interest on overdue obligations.
5. To the extent that the Building Commission may pay interest at the legal rate on the unpaid interest due on the $1,500,000 State Building Revenue Bonds, Science and Culture Center Series (Temporary Bonds), "the Commission might be expending public funds without lawful authority."
6. To the extent the Commission may pay operating expenses from liquor profits made available for the payment of the principal of and the interest on State Building Revenue Bonds, "the Commission might be acting without authority and in contravention of Enrolled House Bill No. 944."
7. Other questions which may arise from the decision of the Court in the Hall case.
Thereafter Honorable John D. Rockefeller, IV, in his capacity as ex officio secretary of the Building Commission, advised the Building Commission by letter that he would not join in publishing the notice of bids for the purchase of the $9,000,000 State Building Revenue Bonds, Science and Culture Center Series, and that he would not execute any such bonds or affix the Great Seal of the State thereto until the legal questions posed by Governor *103 Moore, as stated above, are finally determined by a court of competent jurisdiction.
In the light of the demurrers to the mandamus petition, the Court is called upon to decide whether the two original respondents are justified in refusing to perform the acts demanded of them on the basis of any of the legal questions posed by respondent Moore in his letter to the Building Commission.
Counsel for the original respondents, in their brief, summarize the legal questions presented for decision as follows:
1. Would the sale of the $9,000,000 "Science and Cultural Center Series" bonds, under statutes purporting to authorize that action, be invalid as violative of Article X, Section 4 of the Constitution of West Virginia?
2. Are the provisions of the 1971 Act which authorize, pledge and commit profits from the sale of alcoholic liquors as a source of payment of the bonds in question in violation of Article X, Section 4 of the Constitution of West Virginia?
3. Do the provisions of the 1971 Act lawfully permit occupants of space leased in the buildings "to pay for operation and maintenance charges out of general tax revenues?"
4. May the Building Commission lawfully pay voluntarily "interest on overdue interest on its obligations?"
Counsel for the intervening respondents concur in and adopt as their own the contentions made and legal propositions asserted in the brief of counsel for the two original respondents. Certain additional questions are raised by the demurrer and answer of the intervening respondents and by the brief of their counsel in support of their demurrer and answer. The additional and separate questions thus raised in behalf of the intervening respondents will be referred to and discussed specifically subsequently in this opinion.
The prayer of the mandamus petition is as follows:
"1. That a rule be issued by this Honorable Court directed to the Respondents, the Honorable Arch A. Moore, Jr., Governor of the State of West Virginia, as Chairman of The State Building Commission of West Virginia, and the Honorable John D. Rockefeller, IV, Secretary of State of the State of West Virginia, as Secretary of The State Building Commission of West Virginia.
"A. As to the said the Honorable Arch A. Moore, Jr., and the said the Honorable John D. Rockefeller, IV, to show cause, if any they can, why they should not publish the notice referred to hereinabove for bids for the purchase of the $9,000,000 State Building Revenue Bonds, Science and Culture Center Series, described hereinabove, and, subject to the right to reject all bids therefor, accept the lowest responsible bid and execute and deliver such bonds to such bidder against payment therefor; and,
"B. As to the said the Honorable Arch A. Moore, Jr., to show cause, if any he can, why he should not execute and deliver to the Treasurer of the State of West Virginia the requisitions for funds which he has been directed by the Building Commission to execute and deliver, as aforesaid.
"2. That after the Respondents shall have had an opportunity to respond to such rule that this Honorable Court do issue a preemptory writ of mandamus commanding the Respondents, the Honorable Arch A. Moore, Jr. and the Honorable John D. Rockefeller, IV to carry out and perform the aforesaid directions of the Building Commission.
"3. That this Honorable Court do give your Petitioner such other and further relief as it may deem appropriate and as this case may require."
As we have stated previously, the two questions of major importance in this case *104 involve the use of moneys from the State Road Fund and the application of $3,600,000 annually from profits from the sale of liquor for the purpose of paying the bonds in question.
The State Road Fund was created by the ratification in 1942 of an amendment to the Constitution of West Virginia designated as Section 52 of Article VI, which is as follows:
"Revenue from gasoline and other motor fuel excise and license taxation, motor vehicle registration and license taxes, and all other revenue derived from motor vehicles or motor fuels shall, after deduction of statutory refunds and cost of administration and collection authorized by legislative appropriation, be appropriated and used solely for construction, reconstruction, repair and maintenance of public highways, and also the payment of the interest and principal on all road bonds heretofore issued or which may be hereafter issued for the construction, reconstruction or improvement of public highways, and the payment of obligations incurred in the construction, reconstruction, repair and maintenance of public highways."
By Code, 1931, 17-3-1, as amended, the legislature has implemented the constitutional provision quoted above by language which includes the following:
"When any money is collected from any of the sources aforesaid, it shall be paid into the State Treasury by the officer whose duty it is to collect and account for the same, and credited to the State road fund, and shall be used only for the purposes named in this chapter, that is to say: * * * (b) to pay the expenses of the administration of the road department; (c) to pay the cost of the maintenance, construction, reconstruction and improvement of all primary roads." (Italics supplied.)
State ex rel. State Road Commission v. O'Brien, 140 W.Va. 114, 82 S.E.2d 903, involved a statute which authorized the issuance of bonds for the construction of toll bridges to be used as a part of the state highway system. The statute provided that the bonds would be paid from tolls earned by the use of the bridges by the traveling public and also authorized the allocation of moneys from the State Road Fund as might be needed for payment of the principal of and the interest on the bonds. It was contended that use of moneys from the State Road Fund in these circumstances would create a state debt in violation of the provisions of Article X, Section 4 of the Constitution of West Virginia. In rejecting this contention, the Court stated in part (140 W.Va. 114, 124, 82 S.E.2d 903, 908): "In other words, the moneys which go into this fund do not constitute a part of the general revenues of the State, since they can not be used for general purposes, but only for the purposes specified in the Amendment."
In the case of State ex rel. Appalachian Power Company v. Gainer, 149 W.Va. 740, 143 S.E.2d 351, the Court held that reimbursement of public utilities from the State Road Fund for the costs incurred by them in the relocation of public utility facilities in furtherance of state highway construction was a proper incident of highway construction and that, therefore, a statute providing for such reimbursement was not violative of the provisions of Section 52 of Article VI of the Constitution of West Virginia. For a case directly in point, see Rich v. Williams, 81 Idaho 311, 341 P.2d 432 and other pertinent cases cited and discussed in the court's opinion.
In the light of the authorities previously cited, counsel for the original respondents and counsel for the intervening respondents apparently do not controvert the contention of the Building Commission that moneys from the State Road Fund may be used to pay reasonable rentals for office space used and occupied by the West Virginia Department of Highways and that rental moneys thus received may be used to that extent by the Building Commission for payment of the bonds in question; nor do *105 counsel for the respondents controvert the contention of the Building Commission that moneys from the State Road Fund may be used to defray other reasonable administrative costs of the West Virginia Department of Highways in connection with the occupancy, use and maintenance of the office space used by that department.
We are of the opinion, and therefore the Court holds, that the cost of the construction, maintenance and operation of an office building and related facilities for the sole and exclusive use and occupancy of the West Virginia Department of Highways constitutes a reasonable, necessary and proper incident of the construction, reconstruction, repair and maintenance of the public highway system of the state in conformity with the provisions, intent and purpose of Section 52 of Article VI of the Constitution of West Virginia and related statutory provisions; that such cost may properly be paid from the State Road Fund; that, therefore, the proposed payment of maintenance costs and rentals, to this extent, may be made from the State Road Fund; that such rentals may be used by the Building Commission to pay the principal of and the interest on bonds issued and sold for the purpose of the construction of Building Number 5 and related facilities; and that such proposed expenditure of moneys from the State Road Fund does not constitute the creation of a state debt in violation of the provisions of Section 4 of Article X of the Constitution of West Virginia.
Apparently the pivotal question in this case relates to the constitutionality of the provisions of the 1971 Act which provide for the use of liquor profits, diverted to a special, segregated fund in the hands of the state treasurer, to be used by various agencies or departments of state government for payment of rent for office space leased from the Building Commission as a means of paying the principal of and the interest on "state building revenue bonds of the state" which have been or may be issued and sold by the Building Commission in order to finance the construction of the buildings and related facilities which are to be leased to, occupied and used by the several agencies and departments for state governmental purposes.
Counsel apparently do not agree completely upon the exact scope of the decision of the Court in the Hall case, though the Court had for decision in that case the fairly narrow and restricted question whether the bonds could be paid in the form of rent appropriated from general revenue funds of the state; and, more precisely, whether this amounted to the creation of a state debt in violation of the constitutional inhibition. The Court held that the overall effect of the statute was to create a state debt in violation of the constitutional inhibition and that, therefore, the "fund" which the statute sought to create as a source of payment of rent had "no valid, constitutional existence."
Counsel for the Building Commission insist that the profits from the sale of alcoholic liquors by an agency of the state are "profits" accruing from a proprietary enterprise in which the state engages in the regulation of the sale and use of alcoholic liquors; and that, therefore, funds from this source do not arise from any sort of tax, excise or otherwise, and are not payable from general revenue appropriations.
Counsel for all respondents, on the other hand, insist that the use of a portion of the profits accruing from sale of liquor by the state for the purpose of paying the principal of and the interest on the bonds creates a state debt in violation of the constitutional provision. In support of this contention, counsel for the respondents rely upon the Court's decision in the Hall case, and particularly upon certain portions of the language of the Court used in the body of the opinion in that case.
Counsel for the Building Commission earnestly rely upon the Court's decision in State ex rel. Board of Governors of West Virginia University v. O'Brien, 142 W.Va. *106 88, 94 S.E.2d 446, in which tuition and other student fees were pledged by the legislature to be applied to a special fund to be used in payment of bonds for construction of certain buildings at West Virginia University. In support of the contention of unconstitutionality in that case, it was emphasized that a portion of such fees had theretofore been used by the state as state revenues which were used to support and to maintain the university and that a diversion of such moneys into the special fund to pay the bonds would necessarily result in an increase in legislative appropriation of general revenues of the state and, therefore, an increase of taxes for state purposes. Among other language of a similar nature, the Court stated (142 W.Va. 88, 96-97, 94 S.E.2d 446, 451):
"It is contended that since the proposed bond exhibited with the petition contains a promise by the State to make payment thereof, the same constituted a debt of the State within the meaning of Section 4 of Article X of the Constitution. We do not agree. The promise made is to pay solely out of the special fund to be created, not out of general or property tax revenues but from fees collected from students at the university, other than fees from certain designated schools. No taxes or properties of the State are pledged or in any way made liable for the payment of the bonds. As already made clear, a debt to be paid in such manner does not constitute a debt within the meaning of that constitutional provision. That provision, as previously pointed out, was intended to prohibit the creation of debts, by the State, required to be repaid by a public tax. Such a tax is levied against and constitutes an imposition against the taxpayer. The fees to be collected, and paid into the special fund from which payment of the bonds is to be made, are not such levies but are voluntary payments for benefits to be received from the university, and are subject to the control and disposition of the Legislature." (Italics supplied.)
The constitutional amendment relating to sale of intoxicating liquors, in its present form, was ratified in 1934, as Section 46 of Article VI and is as follows:
"The legislature shall by appropriate legislation regulate the manufacture and sale of intoxicating liquors within the limits of this State, and any law authorizing the sale of such liquors shall forbid and penalize the consumption and the sale thereof for consumption in a saloon or other public place."
The legislature has implemented the constitutional amendment by various provisions in Chapter 60, Code, 1931, as amended. A portion of Section 1 of Article 3 is as follows:
"The sale of alcoholic liquors at wholesale and retail in this State shall be a State monopoly, * * *."
A portion of Section 9 of Article 3 is as follows:
"The commissioner shall, from time to time, fix uniform prices for each variety, class and brand of alcoholic liquors offered for sale in State stores. Alcoholic liquors shall be sold in State stores and agencies only at the uniform prices fixed by the commissioner."
The statutory language quoted above recognizes the right and duty of the Alcohol Beverage Control Commissioner to fix and, from time to time, to alter the prices of alcoholic liquors sold pursuant to the state monopoly. The 1971 Act commands him to fix or to increase profits from sales so as to make it possible for him to pay $3,600,000 annually into the special fund created for the purpose of paying the principal of and the interest on the "State Building Revenue Bonds." Unlike other statutes which heretofore have been held by this Court to create state debts in violation of the constitutional provision in question, the 1971 Act does not deal with funds arising from general revenue appropriations or from any tax, excise or otherwise, imposed by law upon taxpayers.
*107 The moneys arising from profits accruing from the sale of alcoholic liquors by an agency of the state, pursuant to pertinent constitutional and statutory provisions, are funds in a different category from funds involved in any prior decision of this Court involving the constitutionality of statutes in relation to the constitutional provision here in question. The profits from the sale of alcoholic liquors arise from an activity in the nature of a proprietary enterprise in which the state is engaged. Taxes are paid under legal compulsion and, in that sense, they are paid involuntarily. Profits accruing from the sale of alcoholic liquors by the state arise, not from the general public in the form of taxation, but rather from the action of the members of the public who, on a wholly voluntary basis, purchase alcoholic liquors from the state.
The legislature, by the 1971 Act, has properly exercised its legislative prerogative in providing for the application of a portion of the moneys accruing from profits from sales of alcoholic liquors to the payment of the cost of the construction, operation and maintenance of state buildings and related facilities for the use and benefit of certain agencies and departments of state government. This, of course, constitutes an expenditure of state moneys for a public purpose. This Court has repeatedly recognized that the general powers of the legislature, within constitutional limits, are almost plenary and that it may legislate on every subject not interdicted by the Constitution. In considering constitutional restraint, the negation of legislative power must be manifest beyond reasonable doubt. State ex rel. Appalachian Power Company v. Gainer, 149 W.Va. 740, pt. 1 syl., 143 S.E. 2d 351; State Road Commission of West Virginia v. County Court of Kanawha County, 112 W.Va. 98, pts. 2 and 3 syl., 163 S.E. 815.
We are of the opinion, and accordingly the Court holds, that the provisions of the 1971 Act which authorize the use of a portion of the profits accruing from the sale of alcoholic liquors to be used to pay the principal of and the interest on the bonds in question are not violative of the provisions of Section 4 of Article X of the Constitution of West Virginia.
For reasons previously stated, the Court holds that moneys accruing from the sale of alcoholic liquors by the state and paid into the special fund, pursuant to the provisions of the 1971 Act, may lawfully be expended to pay the $9,000,000 "State Building Revenue Bonds, Science and Culture Center Series" and may be used to fund the temporary $1,500,000 "State Building Revenue Bonds, Science and Culture Center Series" and to complete the Science and Culture Center project pursuant to House Concurrent Resolution No. 63, adopted February 12, 1970, which authorized the issuance of the bonds of this series, and pursuant to the pertinent resolution or resolutions adopted by the Building Commission.
The Court further holds that, to the extent that revenues from a project completed with one series of "state building revenue bonds of the state" exceed the amount of revenues required fully to comply with the coverage and debt service requirements of the resolution of the Building Commission which authorized the issuance of the bonds for such project, such excess may be obligated and expended by the Building Commission toward payment of other series of bonds of the Building Commission previously referred to in this opinion; though, of course, no moneys from the State Road Fund may be used to pay the principal of or the interest on bonds except in accordance with the provisions of Section 52 of Article VI of the Constitution of West Virginia by which the State Road Fund was created for the limited purposes therein stated.
We now proceed to consider the question whether the Building Commission may, by its lease agreements, legally require occupants of the buildings to provide for the cost of the operation and maintenance thereof from funds properly available to such occupants, even including general *108 revenue funds appropriated by the legislature. In the light of the Court's decision of other questions previously in this opinion, we are of the opinion and accordingly the Court holds that such payments by occupants would be in conformity with the provisions of the 1971 Act. Broad and comprehensive powers and authority are thereby conferred upon the Building Commission, including the following provision of Section 11 of Article 6 of Chapter 5 as amended by the 1971 Act:
"The commission shall properly maintain, repair, operate, manage and control the project, fix the rates of rental, and establish bylaws and rules and regulations for the use and operation of the project, and may make and enter into all contracts or agreements necessary and incidental to the performance of its duties and the execution of its powers under this article."
The Court holds that occupants of the buildings may be required to provide for the operation and maintenance of the occupied premises from funds properly available to them, including general tax revenues available to such occupants on a fiscal year basis. Obviously, however, the Building Commission would not have power or constitutional authority to require or to bind the legislature to make general revenue appropriations for that purpose for any fiscal year.
The amendments made by the 1971 Act to Sections 9a and 19a of Article 3 of Chapter 60, Code, 1931, as previously amended, specifically provide for payment of the principal of and the interest on the "state building revenue bonds of the state." The statute makes no provision for payment of operating expenses of the Building Commission from profits accruing from the sale by the state of alcoholic liquors.
Section 9a refers to "a special fund hereby created in the office of the state treasurer for the purpose of the payment of principal and interest on bonds of the state known as the `State Building Revenue Bonds,' * * *." By Section 19a as amended by the 1971 Act, the West Virginia Alcohol Beverage Control Commissioner is directed to pay "into the special fund" created by Section 9a the sum of $900,000 on a quarterly basis "for the purpose of retiring bonds of the state known as `State Building Revenue Bonds.'" The following sentence appears in Section 19a as amended by the 1971 Act: "It shall be the duty and responsibility of the state treasurer to pay the principal and interest on said bonds as they become due and payable." We are not aware of any provision of the 1971 Act which could be held to authorize the Building Commission to pay its operating expenses from moneys accruing from profits on the sale of alcoholic liquors. Section 3(6) of Article 6 of Chapter 5, as amended and reenacted by the 1971 Act, contains the following provision: "Provided, That nothing in this article shall be taken to authorize the payment to the commission by or on behalf of the state, of general tax revenues of the state: * *." The Court holds, therefore, that the Building Commission is not authorized by the 1971 Act to pay its operating expenses from profits accruing from the sale of alcoholic liquors by the state.
We now come to a consideration of the questions posed by Governor Moore which are designated as numbers eight and nine, respectively, in his letter to the Building Commission. The questions thus presented are (a) whether payment by the Building Commission of interest at the legal rate on the overdue interest coupons of the $1,500,000 "State Building Revenue Bonds, Science and Culture Center Series (Temporary Bonds)" would violate the state's immunity from payment of interest on overdue obligations; and (b) whether such payment of interest on overdue obligations by the Building Commission would constitute the expenditure of public funds without legal authority. We are of the opinion that the question of the state's immunity would not be involved in such payment of interest. While the statute designates *109 the bonds as "revenue bonds," we have previously held in this opinion that the means contemplated and provided for the payment of the principal of and the interest on the bonds does not result in the creation of a state debt in violation of the provisions of Section 4 of Article X of the Constitution of West Virginia and that the bonds are obligations merely of the Building Commission, payable from sources which are not violative of the constitutional provision in question.
The authority of the Building Commission to issue and to sell the bonds has not been questioned in the present case and was not questioned in the Hall case. Having recognized that the bonds themselves are legal and valid, we believe it follows that they possess the normal incidents and features of bonds. The 1971 Act, as we have previously stated in this opinion, provides that the bonds shall have and are declared to have all the qualities of negotiable instruments.
Guaranty Trust Company of New York v. West Virginia Turnpike Commission, 144 W.Va. 266, 107 S.E.2d 792, involved the question whether interest coupons attached to bonds issued and sold by the turnpike commission bore interest from their respective due dates. The turnpike commission contended that it is such an agency of the state as to be entitled to the immunity from payment of interest which, with certain exceptions, applies to the state. The Court rejected that contention and, in doing so, distinguished the nature of the turnpike commission bonds from bonds which represent direct obligations of the state. In that case, the Court adopted as the first and second points of the syllabus the third and fourth points of the syllabus in Hamilton v. Wheeling Public Service Co., 88 W.Va. 573, 107 S.E. 401, which are as follows:
"3. The general rule is that negotiable interest coupons, attached to or detached from bonds, bear interest from and after their respective maturity dates.
"4. When the interest evidenced by such a coupon has become due and payable, the demand based upon the promise contained therein is no longer a mere incident of the principal indebtedness represented by the bond, but itself becomes a principal obligation."
The temporary bonds in question bear interest at the rate of 5¼ percent. It does not appear from the record that there was any contract for payment of any other or different rate of interest on the overdue interest coupons. We are of the opinion that, in these circumstances, the contractual rate of 5¼ percent payable on the bonds must, under the law of this state, govern the rate of interest payable on the overdue interest coupons from their respective due dates until such interest coupons are paid. The following statement which appears in 47 C.J.S. Interest § 39, page 49, states a principle of law which has been consistently followed and applied in prior decisions of this Court:
"Where the parties have contracted for the payment of a particular lawful rate of interest, to be paid after the maturity of the debt and on default in payment, such contract controls and the rate thus fixed is recoverable. Thus, if the contract provides for a certain rate of interest until the principal sum is paid, such contract generally will control the recovery as to the rate after maturity; in other words, the contract governs until the payment of the principal or until the contract is merged in a judgment."
The following statement appears in 75 A.L.R. at pages 404 and 405 as a part of an annotation dealing with the subject of the proper rate of interest payable after the maturity of a contractual debt:
"Some courts favor the doctrine that where a contract fixes the rate of interest to be paid before maturity, but is silent as to the rate to be paid after maturity, the stipulated rate attends the contract until it is merged in the judgment."
*110 Certain decisions of this Court are cited as authority for the quotation appearing immediately above. Following is the language of the third point of the syllabus in Pickens v. McCoy, 24 W.Va. 344.
"Where a bond by its terms bears interest at three per cent. per annum from date, a decree for the payment thereof should be for the aggregate sum due, the interest being computed at the rate of three per cent. to the date of the decree, and then the decree should provide for the payment of interest thereon at the rate of three per cent. until paid. A decree providing for interest at six per cent. on such aggregate sum is erroneous."
For additional authorities which, in our opinion, support the legal proposition that, in the absence of a contract to the contrary, the rate of interest payable and collectible on the interest coupons is the rate of 5¼ percent, the rate contractually fixed in relation to the principal amount of the bonds, see the following: Turk v. McKinney, 132 W.Va. 460, 461, 52 S.E.2d 388, 389; State ex rel. County Court of Nicholas County v. Morrison, 116 W.Va. 403, 180 S.E. 440; Watson-Loy Coal Co. v. Monroe Coal Mining Co., 85 W.Va. 645, pt. 4 syl., 102 S.E. 485; Morris v. Baird, 72 W.Va. 1, pt. 2 syl., 78 S.E. 371; Shipman v. Bailey, 20 W.Va. 140, pt. 3 syl. The Court holds, therefore, that the overdue interest coupons on the temporary bonds in question bear interest at the rate of 5¼ percent from their respective due dates until paid.
Heretofore in this opinion we have undertaken to decide the several legal questions raised by Governor Moore in his letter to the Building Commission which form the basis of the refusal of the two original respondents to perform the acts which, in this mandamus proceeding, the Building Commission seeks to require them to perform. It is asserted in the mandamus petition, and by the brief and oral argument of counsel for the Building Commission, that the performance of such acts by the two original respondents represent mandatory, nondiscretionary legal duties imposed upon them in their respective official positions as chairman and secretary of the Building Commission; and that, therefore, mandamus is a proper proceeding in this case. We are of the opinion that these contentions are legally valid. State ex rel. West Virginia Housing Development Fund v. Copenhaver, W.Va., pt. 1 syl., 171 S.E.2d 545; State ex rel. Greenbrier County Airport Authority v. Hanna, 151 W.Va. 479, pt. 3 syl., 153 S.E.2d 284.
We will now proceed to consider certain additional questions raised in behalf of the intervening respondents by their demurrer and answer and by the brief and oral argument of their counsel.
Apparently the majority of the intervening respondents are owners or lessees of real estate in an area near the State Capitol which is referred to in the record in this case as the Rose City Block, the location of which will be stated more specifically hereafter in this opinion. While, as we have stated previously, counsel for the intervening respondents concurs in all the views expressed in the brief of counsel for the two original respondents, the additional questions raised in behalf of the intervening respondents are based upon their apprehension or belief that the Building Commission contemplates the acquisition of real estate owned or leased by some of them in the Rose City Block. The intervening respondents deny the present legal authority of the Building Commission to acquire the real estate located in the city block previously referred to, and they make evident their purpose vigorously to resist any effort the Building Commission may make to acquire any portion of such real estate.
The answer of the intervening respondents, supported by appropriate exhibits which are attached to and made a part of the answer, asserts that, at a meeting of the Building Commission held on December 8, 1969, a resolution was adopted by which *111 the Building Commission, by a unanimous vote, requested that Governor Moore include in his call "at the next session of the Legislature" a proposed concurrent resolution authorizing the Building Commission to issue "revenue bonds * * * in an amount not to exceed thirteen million five hundred thousand dollars * * * for the purpose of acquiring the necessary land for the construction of the new state office buildings and parking facilities * * * and for the purpose of constructing, equipping and furnishing the Archives and History Building provided for in the Master Plan." On February 12, 1970, the legislature adopted House Concurrent Resolution No. 63 authorizing and approving "the issuance of additional revenue bonds" by the Building Commission "in an amount not to exceed nine million dollars * * * for the purpose of acquiring the necessary land for the construction of new State office buildings and parking facilities, and for the purpose of constructing, equipping and furnishing a Center for Science and Culture including an Archives and History Building; * * *."
At a meeting held on March 9, 1970, by a resolution duly adopted, the Building Commission accepted the offer of Bache & Co., Incorporated, "to underwrite the Commission's Bonds in the amount of $9,000,000." At the same meeting, the Building Commission, by a resolution duly adopted, directed the chairman to prepare and to issue "the necessary number of temporary certificates in a total amount of not in excess of $1,500,000 * * * for the purpose of obtaining the property from Kanawha Boulevard to the south side of Quarrier Street between Greenbrier Street and Duffey Street, * * *." (Italics supplied.) The italicized portion of the resolution quoted above is emphasized by the intervening respondents because of the fact that the Rose City Block lies between Greenbrier Street and Duffey Street but north of Quarrier Street. The Rose City Block is bounded on the north by Washington Street.
At a meeting held on April 13, 1970, the Building Commission adopted a resolution declaring its purpose to acquire lands and real estate "located in the City of Charleston, West Virginia, in an area from Kanawha Boulevard to the south side of Quarrier Street between Greenbrier Street and Duffey Street." (Italics supplied.) At the same meeting, the Building Commission accepted an offer in writing by Bache & Co. to purchase the temporary bonds in the amount of $1,500,000 at an interest rate of 5¼ percent to "be issued pursuant to and under the applicable resolution adopted by the Commission on April 13, 1970." (Italics supplied.)
At a meeting of the Building Commission held on September 14, 1970, Secretary Rockefeller not being present, William P. Thaw, Deputy Secretary of State, requested that the Building Commission make known its plans regarding the Rose City Block. Thereupon, according to a copy of the minutes of that meeting, "Governor Moore advised Mr. Thaw that the Rose City Block would be taken and instructed him to notify the property owners."
At a meeting of the Building Commission held on October 14, 1970, Secretary Rockefeller being absent, Mr. Thaw stated that "Mr. Rockefeller wished to have a formal motion in regard to the acquisition in the Rose City Block." Thereupon a motion was made and unanimously adopted directing "that the Secretary send a letter to all property owners in the Rose City Block notifying them that their property will be taken by the Commission in the near foreseeable future." (Italics supplied.)
The Hall case was decided on December 15, 1970, the result of which was to declare unconstitutional the means of payment of the bonds involved in that case as provided by the pertinent statute and resolution of the Building Commission. Consequently, at a meeting of the Building Commission held on May 17, 1971, the Building Commission adopted a new and substitute resolution reciting *112 that it had acquired "or will acquire lands * * * in an area from the Kanawha Boulevard to the south side of Washington Street between Greenbrier Street and Duffey Street." (Italics supplied.) The resolution proceeded to refer to the concurrent resolution of the legislature, theretofore adopted, which authorized the issuance of bonds by the Building Commission in an amount not to exceed the sum of $9,000,000 "for the purpose of acquiring the necessary land for the construction of a center for science and culture including an archives and history building * * *." The resolution then proceeded to authorize the issuance of "Bonds of the State to be known as `State Building Revenue Bonds, Science and Culture Center Series' * * * in the aggregate principal amount of not exceeding $9,000,000." The resolution thereafter provided for the issuance of temporary bonds, in either coupon or fully registered form, pending the preparation of definitive bonds. It is obvious that this second resolution providing for the issuance of bonds in the principal amount of $9,000,000 was adopted to comply with the Court's decision in the Hall case and the 1971 Act. The demurrer of the Building Commission admits the truth of all the matters alleged in the answer of the intervening respondents.
Counsel for the intervening respondents contends that the effect of the Court's decision in the Hall case was to nullify House Concurrent Resolution No. 63 which was adopted on February 12, 1970, and which authorized the issuance of "State Building Revenue Bonds, Science and Culture Center Series," in the principal amount of $9,000,000. For reasons previously stated, the Court does not adopt this contention. However, in the present posture of the case, and in the light of the undenied allegations of the answer of the intervening respondents, we cannot decide, and therefore the Court does not now decide, whether the Building Commission presently has authority to acquire any real estate in the Rose City Block for any purpose; whether the Building Commission has any present authority to construct the Science and Culture Center within that area; or whether any property which may be acquired within the Rose City Block may be paid for from any of the proceeds of the sale of the bonds of the $9,000,000 bond series.
We do not find in the record of the case that the Building Commission has any present purpose of acquiring land within the area of the Rose City Block against the will of the owner or owners of any of such property. If the Building Commission should proceed by eminent domain, for instance, as in the Hall case, to take property within the area of the Rose City Block against the will of any owner or owners thereof, the rights of the owners in such circumstances could be properly presented for decision. In the present circumstances, a decision of the rights of the intervening respondents in relation to lands lying within the Rose City Block is premature. We are unable to discern from the record that the Building Commission has performed any overt act in an effort to acquire any property in the area of the Rose City Block. At most, so far as the record in this case discloses, the Building Commission has merely declared its intention to acquire land in that area at some unspecified time which it has described in the minutes of one of its meetings as some time "in the near foreseeable future."
For reasons stated in this opinion, the writ of mandamus as prayed for is awarded.
Writ awarded.