434 S.E.2d 420

**William S.E. WINKLER and Diane Hickle, Plaintiffs Below, Appellees,**

**v.**

**STATE of West Virginia SCHOOL BUILDING AUTHORITY, and United National Bank, a National Banking Association, as Trustee Under the Certain Trust Indenture by and Between the School Building Authority of West Virginia, A Public Body Corporate and United National Bank, as Trustee, Dated January 1, 1990, Securing Capital Improvement Revenue Bonds Series 1990a and Subsequent Series, as Amended and Supplemented, Defendants Below,**

**State of West Virginia School Building Authority, Appellant.**

**William S.E. WINKLER and Diane Hickle, Plaintiffs Below, Appellees,**

**v.**

**STATE OF WEST VIRGINIA SCHOOL BUILDING AUTHORITY, and United National Bank, a National Banking Association, as Trustee Under the Certain Trust Indenture by and Between the School Building Authority of West Vir-**

**ginia, A Public Body Corporate and United National Bank, as Trustee, Dated January 1, 1990, Securing Capital Improvement Revenue Bonds Series 1990a and Subsequent Series, as Amended and Supplemented, Defendants Below,**

**United National Bank, a National Banking Association, as Trustee, Appellant.**

**Nos. 21829, 21830.**

Supreme Court of Appeals of West Virginia.

Submitted July 20, 1993.

Decided July 22, 1993.

James B. Lees, Jr., Hunt, Lees, Farrell & Kessler, Charleston, for plaintiffs.

Harry M. Rubenstein, Kay, Casto, Chaney, Love & Wise, Morgantown, John O. Kizer, Kay, Casto, Chaney, Love & Wise, Charleston, for amicus curiae Board of Educ. of the Counties of Barbour, Doddridge, Gilmer, Harrison, Lewis, Marion, Monongalia, Preston, Randolph, Taylor, Tucker and Upshur.

Michael R. Crane, Alison E. Patient, M.E. Mowery, Charleston, for amicus curiae West Virginia Legislature.

Howard E. Seufer, Jr., Roger D. Hunter, Claudia W. Bentley, Bowles, Rice, McDavid, Graff & Love, Martinsburg, for amicus curiae Boards of Educ. of the Counties of Berkeley, Boone, Braxton, Calhoun, Fayette, Grant, Greenbrier, Hampshire, Hancock, Hardy, Logan, McDowell, Mineral, Ohio, Pleasants, Raleigh, Ritchie, Roane, Wetzel, Wirt, Wood and Wyoming.

Darrell V. McGraw, Jr., Atty. Gen., L. Eugene Dickinson, Asst. Atty. Gen., Charleston, for State of West Virginia School Bldg. Authority.

James K. Brown, Anthony J. Majestro, Jackson & Kelly, Charleston, Cynthia A. Majestro, Charleston, for United National Bank.

David L. Campbell, Charleston, for amicus curiae Honorable Gaston Caperton, Governor of the State of W.Va.

Stuart Calwell, Jacqueline A. Hallinan, Calwell & McCormick, Charleston, for amicus curiae State Bldg. & Constr. Trades Council.

Michael D. Thompson, Pros. Atty., of Jefferson County, Charles Town, amicus curiae.

MILLER, Justice:

The question that we are asked to decide on this appeal is whether the Circuit Court of Kanawha County was in error when it held in its July 9, 1993 order that the Capital Improvement and Revenue and Refunding Bonds, Series 1993, issued by the appellant, State of West Virginia School Building Authority (SBA) in the amount of $338,145,000, were invalid as violating Sections 4 and 6 of Article X of the Constitution of West Virginia.[1] These constitutional provisions restrict the ability of the State to issue bonds that draw upon the State's general revenue funds.

### I.

The appellants are the SBA and the United National Bank (Bank). The Bank is the Trustee under a certain Trust Indenture between it and the SBA dated January 1, 1990, which is part of the bond financing

---

**1.** Section 4 of Article X states:

"No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability of the State, to suppress insurrection, repel invasion or defend the State in time of war; but the payment of any liability other than that for the ordinary expenses of the State, shall be equally distributed over a period of at least twenty years."

Section 6 of Article X states:

"The credit of the State shall not be granted to, or in aid of any county, city, township, corporation or person; nor shall the State ever assume, or become responsible for the debts or liabilities of any county, city, township, corporation or person; nor shall the State ever hereafter become a joint owner, or stockholder in any company or association in this State or elsewhere, formed for any purpose whatever."

arrangements. The appellees are two citizens and taxpayers who sought a declaratory judgment with attendant injunctive relief against the SBA on June 16, 1993, in the Circuit Court of Kanawha County.[2] Their claim was that the 1993 Series revenue bonds about to be issued pursuant to W.Va.Code, 18-9D-1, *et seq.*, were unconstitutional because issuance of the bonds violated the provisions of Sections 4 and 6 of Article X of the West Virginia Constitution prohibiting state debt.

On June 21, 1993, the circuit court granted the Bank the right to intervene in this case. After several hearings were held, the circuit court, by order entered July 9, 1993, held that issuance of the bonds was unconstitutional, and therefore enjoined the SBA from issuing the bonds. The basis for the circuit court's holding was that the bonds commit the State Legislature to fund the bonds' retirement and that this commitment constitutes an impermissible debt against the State. We granted this appeal on July 13, 1993, on an expedited basis because of the urgent need for a decision on the issues involved in this case.[3] A full hearing was held on July 20, 1993.

There is no question that the challenged bonds were authorized by the SBA under the provisions of W.Va.Code, 18-9D-1, *et seq.* The general outline of that article, with regard to the bond arrangement, is as follows. Under Section 4, the SBA may issue revenue bonds under the guidelines set out in that section. Pursuant to Section 6, a building capital improvement fund is "created in the state treasury." This same section authorizes the SBA to pledge this fund to liquidate the revenue bonds. Section 8 provides further directions as to the issuance of the bonds, the trust indenture agreement, and the pledge of funds to liquidate the bonds. Section 12 spells out in more detail the trust agreement for the benefit of the bondholders. Section 13 mandates that a sinking fund be created in the State Treasurer's office in order to liquidate the bonds. Finally, under Section 14, this statement is made:

"No provisions of this article shall be construed to authorize the school building authority at any time or in any manner to pledge the credit or taxing power of the state, nor shall any of the obligations or debts created by the school building authority under the authority herein granted be deemed to be obligations of the state."

It is Section 14, together with the disclaimer on the face of the bonds and language in the trust agreement, that causes the appellants to claim that the bonds are neither legal obligations of the State nor of the SBA, and therefore, that the bonds do not constitute a debt obligation of the State under Sections 4 and 6 of Article X of the West Virginia Constitution. The relevant proposed bond language is as follows:

"The Series 1993 Bonds are limited obligations of the Authority payable solely from the Trust Estate pledged under the Indenture. The Authority may not at any time or in any manner pledge the credit or taxing power of the State, nor shall any of the obligations or debts created by the Authority under the Indenture be deemed to be obligations of the State.

"The Series 1993 Bonds are being issued on a parity with the lien of certain outstanding bonds of the Authority on amounts on deposit in the Revenue Fund. All Bonds issued under the Indenture are

---

**2.** Earlier, on June 14, 1993, the appellees filed an original prohibition in this Court asking us to prohibit the SBA from issuing its 1993 Series revenue bonds. We deemed prohibition to be an inappropriate remedy because it is available only against judicial officers. *See* Syl. pt. 2, *State ex rel. City of Huntington v. Lombardo,* 149 W.Va. 671, 143 S.E.2d 535 (1965); Syl. pt. 2, *State ex rel. Noce v. Blankenship,* 93 W.Va. 273, 116 S.E. 524 (1923); Syl. pt. 4, *Fleming v. Commissioners,* 31 W.Va. 608, 8 S.E. 267 (1888). The SBA is a state administrative agency created by W.Va.Code, 18-9D-1, *et seq.* Consequently, we refused the petition without prejudice.

**3.** Part of the urgency, as indicated in an affidavit filed by the Bank, is that a decision must be made before August 15, 1993, in order to meet an IRS regulation deadline. If the deadline is not met, some $5 million will be lost on potential bond refunding interest. (*See* Part IV, *infra,* for a discussion of the bond refunding question.)

secured by a pledge of moneys appropriated by the West Virginia State Legislature and transferred to United National Bank, as the trustee, for deposit in the Revenue Fund established under the Indenture. AMOUNTS AVAILABLE TO BE TRANSFERRED TO THE TRUSTEE FOR DEPOSIT IN THE REVENUE FUND ARE SUBJECT TO ANNUAL APPROPRIATION BY THE STATE LEGISLATURE. THE STATE LEGISLATURE IS NOT LEGALLY OBLIGATED TO MAKE APPROPRIATIONS IN AMOUNTS SUFFICIENT TO PAY DEBT SERVICE ON THE BONDS." [4]

The applicable language in the trust agreement relied upon by the appellants is:

"All Bonds issued under the Indenture, including the Series 1993 Bonds, are secured by a pledge of Revenues. 'Revenues' means (i) any moneys appropriated by the State Legislature, deposited in the Building Fund and transferred to the Trustee in conformance with the Constitution and laws of the state and (ii) any other moneys, income or property pledged by the Authority to the payment of Bonds.

"Moneys appropriated by the Legislature and transferred to the Trustee are currently the sole source of Revenues. AMOUNTS AVAILABLE TO BE TRANSFERRED TO THE TRUSTEE ARE SUBJECT TO ANNUAL APPROPRIATION BY THE LEGISLATURE. THE STATE LEGISLATURE IS NOT LEGALLY OBLIGATED TO MAKE APPROPRIATIONS IN AMOUNTS SUFFI-

CIENT TO PAY DEBT SERVICE ON THE BONDS." [5]

Before addressing the merits of the particular bond issue in this case, it is useful to review some of our prior cases analyzing Sections 4 and 6 of Article X of the West Virginia Constitution.

## II.

### A.

We wish to say at the outset that we are fully aware of the gravity of the bond issue in this case, particularly since it relates to our public educational system. This Court has not been insensitive to the needs of our school system. Almost fifteen years ago in *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979), we spoke forcefully to these needs, stating that the Thorough and Efficient Education Clause in Section 1 of Article XII of the West Virginia Constitution was not an empty vessel.[6] We mandated in *Pauley* that our entire educational system be closely scrutinized and appointed a special judge to oversee this review.[7]

*Pauley* did not address the question of the issuance of bonds to fund school building construction and capital improvements. The appellees appear to suggest that the Thorough and Efficient Education Clause can validate revenue bonds that are authorized by the Legislature, but are found to be unconstitutional under Sections 4 and 6 of Article X of our Constitution. We cannot agree with such an assertion because the generality of the Thorough and Efficient Education Clause in Section 1

---

**4.** The proposed bond language cited in the text is taken from the cover sheet to the Preliminary Official Statement which is Exhibit 1 of the Bank's Appendix to its Petition for Expedited Appeal filed July 12, 1993.

**5.** The Trust Indenture language is taken from page 22 of the Official Preliminary Statement, part of Exhibit 1 of the Bank's Appendix to its Petition for Expedited Appeal filed July 12, 1993.

**6.** In Syllabus Point 3 of *Pauley, supra,* we stated: "The mandatory requirements of 'a thorough and efficient system of free schools' found in Article XII, Section 1 of the West Virginia Constitution, make education a fundamental, consti-

tutional right in this State." In *Pauley,* we created a higher constitutional standard for public education than the United States Supreme Court was willing to create in *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

**7.** This review was conducted by the Honorable Arthur M. Recht, Judge of the Circuit Court of Ohio County, and a summary of the events following *Pauley v. Kelly, supra,* is contained in *State ex rel. Boards of Education of the Counties of Upshur, et al. v. Chafin,* 180 W.Va. 219, 376 S.E.2d 113 (1988).

of Article XII [8] of our Constitution cannot override the more specific provisions on state debt limitation contained in Sections 4 and 6 of Article X. We pointed out in *State ex rel. Brotherton v. Blankenship,* 157 W.Va. 100, 108, 207 S.E.2d 421, 427 (1973), that: "Questions of constitutional construction are in the main governed by the same general rules as those applied in statutory construction." (Citation omitted). *See also State ex rel. City of Princeton v. Buckner,* 180 W.Va. 457, 461–62, 377 S.E.2d 139, 143 (1988).

■ We have frequently utilized the rule of statutory construction set out in Syllabus Point 1 of *UMWA by Trumka v. Kingdon,* 174 W.Va. 330, 325 S.E.2d 120 (1984):

"The general rule of statutory construction requires that a specific statute be given precedence over a general statute relating to the same subject matter where the two cannot be reconciled."

Finally, we acknowledge that when we are called upon to determine the constitutionality of a legislative enactment, we are guided by various restraints that we have imposed upon our judicial powers, as we outlined in Syllabus Point 4 of *Tony P. Sellitti Construction Co. v. Caryl,* 185 W.Va. 584, 408 S.E.2d 336 (1991), *cert. denied,* — U.S. ——, 112 S.Ct. 969, 117 L.Ed.2d 135 (1992):

" ' "In considering the constitutionality of a legislative enactment, courts must exercise due restraint, in recognition of the principle of the separation of powers in government among the judicial, legislative and executive branches. [*W.Va. Const.* art. V, § 1.] Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question. Courts are not concerned with questions relating to legislative policy. The general powers of the legislature, within constitutional limits, are almost plenary. In considering the constitutionality of an act of the legislature, the negation of legislative power must appear beyond reasonable doubt." Syl. pt. 1, *State ex rel. Appalachian Power Co. v. Gainer,* 149 W.Va. 740, 143 S.E.2d 351 (1965).' Syl. pt. 2, *West Virginia Public Employees Retirement System v. Dodd,* 183 W.Va. 544, 396 S.E.2d 725 (1990)."

### B.

■ We begin our legal discussion regarding the validity of these school revenue bonds by noting that there is a category of bonds that override the specific limitations contained in Sections 4 and 6 of Article X. They are bonds that the Legislature issues after following the procedures contained in Section 2 of Article XIV of our Constitution relating to constitutional amendments.[9] Under the amendment procedure, a majority of qualified voters voting on the issue must approve the issuance of the bonds.[10]

8. Section 1 of Article XII of the West Virginia Constitution simply states: "The legislature shall provide by general law for a thorough and efficient system of free schools."

9. The relevant portion of Section 2 of Article XIV of the Constitution states:

"Any amendment to the Constitution of the State may be proposed in either house of the legislature at any regular or extraordinary session thereof; ... by two thirds of the members elected thereto, the proposed amendment, with the yeas and nays thereon, shall be entered on the journals, ... at a special election, or at the next general election thereafter, and cause the same to be published, at least three months before such election in some newspaper in every county in which a newspaper is printed. If a majority of the qualified voters, voting on the question at the polls held pursuant to such law, ratify the proposed amendment, it shall be in force from the time of such ratification, as part of the Constitution of the State."

10. The Amendments to the West Virginia Constitution that have authorized bonds, with the years they were ratified, are as follows:

The Good Roads Amendment of 1920
The Good Roads Amendment of 1928
Fifty Million Dollar Bond Issue for Roads Amendment (1948)
Veterans Bonus Amendment (1950)
Korean Veterans Bonus Amendment (1956)
Better Roads Amendment (1964)
Roads Development Amendment (1972)
Better School Buildings Amendment (1972)
Vietnam Veterans Bonus Amendment (1973)
Better Highways Amendment (1973)

Bonds issued pursuant to a constitutional amendment override the more general bond limit restrictions because they were approved by the voters for the specific purposes contained in the amendment. Thus, under our traditional rules of constitutional construction, these bonds supersede the general bond limitations. *See State ex rel. Brotherton v. Blankenship, supra; State ex rel. City of Princeton v. Buckner, supra.* The bonds in this case do not fall into the category of bonds approved by constitutional amendment.[11]

## C.

■ The two constitutional provisions at issue in this case, Sections 4 and 6 of Article X, have been interpreted by this Court to serve the common purpose of restricting the Legislature's ability to create long-term debt.[12] These provisions are often cited together in the same case; however, each provision serves a separate purpose. The restrictions contained in Section 4 of Article X deal with the creation of long-term debt by the State or its agencies

through revenue bonds or other similar obligations by way of legislative enactments. *See State ex rel. Board of Governors of West Virginia University v. O'Brien,* 142 W.Va. 88, 97, 94 S.E.2d 446, 451 (1956). Moreover, in *State ex rel. County Court of Marion County v. Demus,* 148 W.Va. 398, 409, 135 S.E.2d 352, 359 (1964), we compared the purpose of Section 6 of Article X with Section 4, noting: "Section 4 of Article X of the Constitution imposes upon the state limitations with respect to indebtedness similar to those imposed upon counties and cities by Article X, Section 6 of the Constitution[.]" Indeed, the plain language of Section 6 is designed to restrict the State from granting credit to subordinate political subdivisions such as municipalities and counties, as well as to forbid the State from granting credit or assuming liabilities for debts of private persons or other entities.[13]

■ Earlier, in *Bates v. State Bridge Commission,* 109 W.Va. 186, 188, 153 S.E. 305, 306–07 (1930), in alluding to the purpose of Section 4 of Article X, we spoke about "the experience of the mother state

Qualified Veterans Housing Bonds Amendment (1984)
Veterans Bonus Amendment (1992)

**11.** Another limitation on the restrictions under Section 6 of Article X, which limits the State's extension of credit or money to municipalities, counties, or other political subdivisions, is found in Section 6a of Article X. This article permits the State (1) to appropriate state funds for federal matching funds, and (2) to dedicate a state tax, or a portion thereof, to the benefit and use of municipalities, counties, or other political subdivisions. The amendment was adopted in 1972. We addressed some aspects of this amendment in *State ex rel. Boards of Education v. Chafin,* 180 W.Va. 219, 376 S.E.2d 113 (1988), and *State ex rel. Kanawha County Building Commission v. Paterno,* 160 W.Va. 195, 233 S.E.2d 332 (1977). Section 6a of Article X is not asserted in this case.

**12.** In *State ex rel. Resource Recovery–Solid Waste Disposal Authority v. Gill,* 174 W.Va. 109, 111, 323 S.E.2d 590, 592–93 (1984), we echoed these same sentiments: "The clear purpose of these provisions is to protect the fiscal integrity of the State by prohibiting creation of any present indebtedness that would obligate subsequent

legislatures to make appropriations." (Citations omitted).

**13.** As we pointed out in note 11, *supra,* although Section 6a of Article X is not involved in this case, it provides an exception to the prohibitions found in Sections 4 and 6. The text of Section 6a is:

"Notwithstanding the provisions of section six of this article, (1) the legislature may appropriate state funds for use in matching or maximizing grants-in-aid for public purposes from the United States or any department, bureau, commission or agency thereof, or any other source, to any county, municipality or other political subdivision of the State, under such circumstances and subject to such terms, conditions and restrictions as the legislature may prescribe by law, and (2) the legislature may impose a state tax or taxes or dedicate a state tax or taxes or any portion thereof for the benefit of and use by counties, municipalities or other political subdivisions of the State for public purposes, the proceeds of any such imposed or dedicated tax or taxes or portion thereof to be distributed to such counties, municipalities or other political subdivisions of the State under such circumstances and subject to such terms, conditions and restrictions as the legislature may prescribe by law."

with debts contracted by her," [14] of which the framers of our 1872 Constitution were aware and therefore "provided that this state should not contract indebtedness, except in specified instances[.]" 109 W.Va. at 189, 153 S.E. at 307. Moreover, in *State ex rel. West Virginia Housing Development Fund v. Waterhouse*, 158 W.Va. 196, 208–09, 212 S.E.2d 724, 731 (1974), the purpose of Section 6 of Article X was given the following summary: "This Court expressly noted that the 'purpose of Section 6 of Article X was to guard against the granting of the credit of the State in aid of any county, city, township, corporation or person....'." *Quoting State ex rel. Dyer v. Sims*, 134 W.Va. 278, 289, 58 S.E.2d 766, 773 (1950), *rev'd on other grounds*, 341 U.S. 22, 71 S.Ct. 557, 95 L.Ed. 713 (1951).

Thus, we believe our cases make clear the substantive distinction between the provisions of Sections 4 and 6 of Article X of our Constitution. In this case, we deal only with Section 4. In *State ex rel. Dyer v. Sims, supra*, in regard to Section 4 of Article X, we stated in Syllabus Point 5:

> "Under Section 4, Article X, of the Constitution of this State, the Legislature is without power to create an obligation to appropriate funds, for a purpose not mentioned in said section, by future Legislatures. Such legislation, if otherwise valid, would be void under said section, as creating a debt inhibited thereby."

Although the wording of Syllabus Point 5 of *State ex rel. Dyer v. Sims, supra*, is somewhat awkward, it seems clear that the Court did not literally mean that any contract entered into by a state agency that extended over more than one year was constitutionally infirm. *Dyer* recognized that by creating state agencies, the Legislature was obligating itself, in a constitutionally permissible manner, to pay funds

necessary for those agencies' operational expenses from future general revenue funds:

> "Ordinarily, the creation of a State board or commission which requires an appropriation of public funds to carry out its purposes is not treated as the creation of a debt, although its generally contemplated continuation from year to year, and for an indefinite period, must necessarily involve future appropriations. Practically all agencies created by the Legislature require appropriations from time to time, and that was necessarily contemplated at the time they were created." 134 W.Va. at 290, 58 S.E.2d at 773.

Much of this same type of reasoning also was recognized in *State ex rel. Hall v. Taylor*, 154 W.Va. 659, 672, 178 S.E.2d 48, 56 (1971), where we said: "[A]dmittedly it is contemplated by the statute that the rent will be paid from general revenue funds to be appropriated by the Legislature to the various agencies and departments of the state government from year to year." Moreover, in *State ex rel. Board of Governors v. Sims*, 133 W.Va. 239, 244, 55 S.E.2d 505, 508 (1949), we specifically recognized that the Legislature's creation of a pension system, which required periodic funding from general revenues, did not constitute "the creation of a debt inhibited by Section 4 of Article X of the Constitution."

It is the fact that state agencies have recurring needs for services, such as rental space and utility services, that form the basis for our cases approving the State's lease-financing arrangements. In such a situation, the lease payments are used to retire revenue bonds that were issued to construct the building. *See State ex rel. State Bldg. Comm'n v. Moore*, 155 W.Va. 212, 184 S.E.2d 94 (1971). The foregoing

---

**14.** The full text of *Bates*, 109 W.Va. at 188–89, 153 S.E. at 306–07, with regard to Virginia's financial plight, is as follows:

"When our Constitution of 1872 was formed, the experience of the mother state with debts contracted by her, and with suits to compel payment, were fresh in the minds of the framers of that Constitution. Numerous suits ending in heavy judgments and costs had been

prosecuted against the commonwealth; illiberal contracts and guaranties of enterprises had been made by governmental agencies detrimental to her interests; public officers and agencies had not been always zealous and careful in the conduct of public affairs; and juries leaned toward the individual as against the commonwealth."

rationale formed the basis for our approval of the energy supply contract entered into by the West Virginia University in *State ex rel. West Virginia Resource Recovery–Solid Waste Disposal Authority v. Gill,* 174 W.Va. 109, 323 S.E.2d 590 (1984), even though the contract was not a lease. We stated in Syllabus Point 1 of *Gill:* "Bonds of a state or political subdivision payable solely out of revenue derived from a utility of a public nature acquired by the money derived from the bonds do not create debts within the constitutional inhibition against the contraction of public debt."

Moreover, the foregoing rationale also was behind our approval of the issuance of industrial and commercial revenue bonds under W.Va.Code, 13–2C–1. Under this legislation, a county acquires land and contracts with a private corporation to lease the land for a rental sufficient to retire the bonds that are issued by the county to secure the funds to build the facility. *See, e.g., State ex rel. Ohio County Comm'n v. Samol,* 165 W.Va. 714, 275 S.E.2d 2 (1980); *State ex rel. County Court of Marion County v. Demus, supra.* All these various types of lease arrangements have been generally accepted elsewhere as valid against a claim of constitutional debt infirmity.[15]

In addition, we have given our approval to the payment of revenue bonds that are liquidated out of a special fund. This concept is related to the lease-financing arrangement, but differs because the special fund is ordinarily a tax or a fee generated from the facility itself, such as tolls for the use of a bridge or road, or parking-garage fees. In *State ex rel. Hall v. Taylor,* 154 W.Va. at 672, 178 S.E.2d at 56, we stated the general basis for the special fund concept:

"It is difficult to state the 'separate fund doctrine' precisely. Its application varies somewhat among appellate courts of various states. It is applied uniformly in relation to projects or facilities which are self-liquidating, such as the toll bridge cases. Some courts hold that the doctrine applies in any case of a fund created by a special excise tax as distinguished from property taxes."

The special fund doctrine provided the basis for both our approval of the State Road Commission's special fund to generate revenues to construct the building for the Department of Highways in *State ex rel. Building Commission v. Moore, supra,* and the use of the Alcoholic Beverage Control Commission's profits in the same case to fund the construction of its warehouse. The same rationale supports our toll-bridge cases [16] and our cases dealing with the construction of student dormitories at West Virginia University out of special student fees.[17] The special fund doctrine is generally recognized in other jurisdictions as not being violative of constitutional debt limitations.[18]

**15.** *See, e.g., Opinion of the Justices No. 183,* 278 Ala. 298, 178 So.2d 76 (1965) (bonds issued to build correctional facilities and financed by rental income from those buildings not considered unconstitutional state debt); *Cochran v. Mayor of Middleton,* 14 Del.Ch. 295, 125 A. 459 (1924); *St. Charles City–County Library Dist. v. St. Charles Library Bldg. Corp.,* 627 S.W.2d 64 (Mo.App.1981) (lease-purchase arrangement between library district and nonprofit corporation was not an unconstitutional lending of state credit); *Enourato v. New Jersey Bldg. Auth.,* 90 N.J. 396, 448 A.2d 449 (1982); *Halstead v. McHendry,* 566 P.2d 134 (Okla.1977); *McFarland v. Barron,* 83 S.D. 639, 164 N.W.2d 607 (1969); *Municipal Bldg. Auth. v. Lowder,* 711 P.2d 273 (Utah 1985); *State ex rel. Thomson v. Giessel,* 271 Wis. 15, 72 N.W.2d 577 (1955).

**16.** *See, e.g., State ex rel. State Road Comm'n v. O'Brien,* 140 W.Va. 114, 82 S.E.2d 903 (1954).

**17.** *See, e.g., State ex rel. Bd. of Governors, W.Va. University v. O'Brien, supra.*

**18.** *See, e.g., Davis v. Pueblo,* 158 Colo. 319, 406 P.2d 671 (1965) (bonds financed by parking fees were revenue bonds and thus did not violate constitutional inhibition on indebtedness); *Perl–Mack Civic Ass'n v. Board of Directors of Baker Metro. and Sanitation Dist.,* 140 Colo. 371, 344 P.2d 685 (1959) (bonds issued to build sewage disposal plant and financed by revenues derived from its subsequent operation was not unconstitutional indebtedness); Syl. Pt. 1, *Naftalin v. King,* 252 Minn. 381, 90 N.W.2d 185 (1958) (indebtedness not considered unconstitutional if payable only from a special fund, the proceeds of which are derived from a levy and tax collection authorized for that specific purpose); *Board of Cty. Comm'rs v. Idaho Health Fac. Auth.,* 96 Idaho 498, 531 P.2d 588 (1974) (bonds issued to build hospitals and financed solely

The appellants argue that both the special fund doctrine and the service contract or lease agreement concept still involve funds that ultimately can be said to come from potential general revenue sources. Thus, they assert that these principles, which we have acknowledged to be acceptable as not violating Section 4 of Article X, are really no different than the more direct payments from general revenue funds used in this case.

We disagree because appellants overlook several significant differences. First, the special fund doctrine is based on the fact that a *specific source of revenue* is required to be identified and committed to the repayment of the bonds beyond mere annual appropriations from the general revenue fund. Second, by identifying and dedicating this specific source of funds, the process automatically limits the total value of bonds that can be used. The Legislature will have to quantify initially the amount it is willing to commit in order to avail itself of the special fund doctrine.

Much the same process occurs in the case of a service contract or lease arrangement. There, the revenue source is the rental payments or the amounts paid under the service contract. These amounts are ultimately controlled by the cost of the building, which determines the total value of bonds to be issued. The cost of the proposed building, in turn, will be governed by economic and market considerations which limit the cost of the project and the total value of bonds to be issued.

In other words, these funding sources, which we have approved in earlier cases,

have built-in restraints that must be considered by the Legislature when it authorizes legislation for the issuance of the bonds. In this case, the bonds have no such identifiable controls because their payment is directly from the general revenue fund. There is no statutory restriction on the total value of SBA bonds that may be issued and, unlike special-fund or lease-payment bonding, there is no identifiable source that controls the total value of bonds to be issued.[19]

From the foregoing law, the general principle emerges that Section 4 of Article X is not designed to prohibit the State or the State's agencies from issuing revenue bonds that are payable from contracts that require rental payments of another state agency or require other necessary recurring contractual expenses such as utilities; nor does this constitutional provision preclude the issuance of revenue bonds which are to be redeemed from a special fund.

### D.

The appellants place primary reliance on *State ex rel. West Virginia Resource Recovery–Solid Waste Disposal Authority v. Gill,* 174 W.Va. 109, 323 S.E.2d 590 (1984), and in particular, on Syllabus Point 3:

"The ultimate issue in determining whether bond financing creates a state debt in violation of Article X, Section 4 [of the West Virginia Constitution] is not whether the bonds may be paid from future legislative appropriations, but

---

from rates, rents, fees and charges for the use of and for the services furnished or to be furnished by each facility did not violate constitutional prohibition on indebtedness); *Eakin v. State ex rel. Capital Imp. Bd.,* 474 N.E.2d 62, 65 (Ind. 1985) ("It is through [the constitutional] limitation [on indebtedness that] the interests of the generations are protected from being saddled with spending excesses." Exceptions to the constitutional inhibition include the special funds doctrine and revenue bonds); *Woodmansee v. Kansas City,* 346 Mo. 919, 144 S.W.2d 137 (1940) (voter endorsement of bond issuance to finance city market expansion constitutionally unnecessary because bonds financed from income from city market, and thus did not amount to unconstitutional indebtedness); *State ex rel. Capitol*

*Addition Bldg. Comm'n v. Connelly,* 39 N.M. 312, 46 P.2d 1097 (1935) (issuance of bonds financed from a special fund created by filing fees from civil actions did not constitute a debt requiring a referendum under state constitution). *See generally* Annot., *Obligation Payable From Special Fund Created by Imposition of Fees, Penalties or Excise Taxes as a "Debt" with Constitutional Debt Limitation,* 100 A.L.R. 900 (1936).

19. This is not to say that the Legislature could validate these bonds by merely identifying a total dollar amount that could be issued. There would still be the necessity of identifying a *particular source* of funds for their payment.

whether successive legislatures are obligated to make such appropriations."

We do not find *Gill* persuasive simply because in *Gill* there was a revenue source for liquidation of the bonds that was independent of a direct grant from the State's general revenue fund. In *Gill*, the West Virginia Resource Recovery–Solid Waste Disposal Authority (Authority) was authorized to issue revenue bonds to construct a power generating facility in Morgantown. West Virginia University had contracted to purchase a substantial amount of its energy use from the Authority and the University's payment for this service was to be used to liquidate the bonds issued by the Authority.

In the instant case, the appellants argue that although future legislative appropriations may be used to pay for the bonds, it is clear from the language of the bonds themselves that there is no legal obligation requiring the Legislature to make such appropriations. Certainly, Syllabus Point 3 of *Gill*, if divorced from the facts in that case, could be used to support the appellants' position. However, this syllabus point was derived from a conclusory statement at the end of the opinion. There was no discussion therein of its impact on Section 4 of Article X of our Constitution beyond the facts of *Gill*.

From a literal standpoint, if Syllabus Point 3 of *Gill* is the litmus test for the constitutionality of bonds issued by a state authority, then the constitutional limitation of Section 4 of Article X is meaningless. Under such an interpretation, the Legislature could authorize the State or its agencies to issue bonds in any amount so long as the bonds are used for a public purpose,[20] and so long as the terms of the bonds make clear that the bonds are not state obligations and that the Legislature is under no obligation to fund the bonds.

It is difficult for us to understand how the *Gill* case, under its facts, could be construed to authorize a radical change from our earlier bond cases.[21] Certainly, the financing arrangement for the bonds in *Gill* was markedly different from the financing arrangement for the bonds in this case. The critical language in *Gill* followed a lengthy discussion and citation of cases approving long-term contracts by public agencies for the purchase of necessary services and concluded with this language: "We see no reason why the so-called 'service contract doctrine' should not apply to contracts entered into by the State or its agencies to buy energy." 174 W.Va. at 114, 323 S.E.2d at 595. (Citation omitted).

The obvious import of *Gill* was to loosen the rather harsh restrictions created in *State ex rel. Hall v. Taylor, supra,* as to the use of lease contracts to finance the retirement of revenue bonds. In *Hall*, the Legislature authorized the State Building Authority to issue some $24,000,000 in revenue bonds. The proceeds of the bonds were to be used to build several office buildings for the purpose of housing a variety of state agencies. The revenues for the repayment of the bonds were to come from rents paid by the various state agencies leasing the buildings. We concluded that because the agencies were funded by general revenue appropriations from the Legislature, that the Legislature would thus be required to pay the agencies' rents from such funds. This arrangement would create a state debt in violation of Section 4 of Article X of our Constitution.

Certainly, *Gill*'s attempt to rectify *Hall* might have been better understood if its language were more precise. *Gill* also might have mentioned *State ex rel. State Building Commission v. Moore,* 155 W.Va. 212, 184 S.E.2d 94 (1971), where we

---

20. The requirement that legislative appropriations may only be made for public purposes has been recognized in a number of our cases. *State ex rel. Lippert v. Gainer,* 146 W.Va. 840; 122 S.E.2d 618 (1961); *State ex rel. Bd. of Governors v. Sims,* 140 W.Va. 64, 82 S.E.2d 321 (1954); *State ex rel. Catron v. Sims,* 133 W.Va. 610, 57 S.E.2d 465 (1950).

21. If *Gill* augured such a radical constitutional departure from our revenue bond law, one wonders why the test case was needed three years later in *State ex rel. Department of Employment Security v. Manchin,* 178 W.Va. 509, 361 S.E.2d 474 (1987). There, we approved revenue bonds that were to be liquidated from a special tax on employers and wage earners.

approved the legislative authorization of the use of certain State Road Fund monies as rent for office space for the Department of Highways in a building constructed by the State Building Commission. The rental payments were to be utilized to liquidate revenue bonds issued by the Commission in order to build the facility. *Moore* also approved of a separate statutory provision that authorized a special fund from the sale of liquor "to be used by various agencies or departments of state government for payment of rent for office space leased from the Building Commission as a means of paying the principal of and the interest on 'state building revenue bonds of the state' . . . issued . . . to finance the construction of the buildings[.]" 155 W.Va. at 231, 184 S.E.2d at 105. We found in Syllabus Point 4 of *Moore* that the legislation at issue therein did not violate Section 4 of Article X of our Constitution.[22]

We earlier observed that none of our prior cases, including *Gill*, have ever considered a revenue bond mechanism similar to the one in the present case. Our earlier cases share a common mechanism for constitutional acceptance, i.e., the revenue bonds were payable from either a special fund dedicated to the purpose for which they were issued or were payable from lease rental payments or similar contract arrangements for a necessary service on the part of the public agency. Here we are faced with bonds issued by the SBA which will be liquidated by legislative appropriations from the general fund that the Legislature is not legally obligated to make. The ultimate contention in favor of the bonds' constitutionality is that because there is no legal obligation to pay the bonds, then there is no state debt created.

Consequently, there is no violation of Section 4 of Article X.

While we may admire the legal sophistry of this argument, it defies our practical judgment. If the bonds are not paid, it is obvious that the State's credit will be impaired. The default on a bond issue of this size hardly can be expected to draw cheers from the bondholders or their brokerage houses or the bond financial rating services.[23]

In considering the validity of revenue bonds, *Hall v. Taylor, supra,* admonishes us that "[i]t is the duty of this Court . . . to consider the substance of the plan envisioned by the statute in determining the question of constitutionality." 154 W.Va. at 673, 178 S.E.2d at 57. (Citation omitted). Moreover, *Hall* espoused the concept that a "mere legislative declaration that a state debt is not created . . . is not conclusive or binding on a court." 154 W.Va. at 674, 178 S.E.2d at 57. Following other jurisdictions, *Hall* held that it is a judicial and not a legislative question "[w]hether a state debt is created by [a] statute[.]" 154 W.Va. at 674, 178 S.E.2d at 57.

There are several cases from other jurisdictions that have dealt with revenue bonds issued in a fashion similar to the bonds in this case. The appellants point to *Dykes v. Northern Virginia Transportation District Commission*, 242 Va. 357, 411 S.E.2d 1 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2275, 119 L.Ed.2d 201 (1992), where the Fairfax County Board of Supervisors entered into a contract to issue $300,000,-000 in revenue bonds to finance construction of a highway. The Board of Supervisors agreed to pay for the liquidation of the bonds out of its general revenue funds. However, the contract had qualifying language stating:

**22.** Syllabus Point 4 of *Moore* states:

"To the extent that Chapter 167, Acts of the Legislature, Regular Session, 1971, authorizes and directs the West Virginia Alcohol Beverage Control Commissioner to pay into a special fund created by that statute in the office of the state treasurer the sum of $3,600,000 annually, from profits accruing from the sale of alcoholic liquors by the state, for the ultimate purpose of paying the principal of and the interest on bonds issued and sold by The

State Building Commission of West Virginia for the construction of buildings and related facilities to be used by various departments or agencies of the state, the statute in question does not create or incur a state debt in violation of the provisions of Section 4 of Article X of the Constitution of West Virginia."

**23.** As indicated in note 26, *infra,* these new revenue bonds would amount to almost 15 percent of our total revenue bond indebtedness.

"[N]othing in this Contract shall be deemed to obligate the Board of Supervisors of the County to appropriate any sums on account of any payments to be made by the County hereunder. This Contract shall not constitute a pledge of the full faith and credit of Fairfax County or a bond or debt of Fairfax County in violation of Section 10 of Article VII of the Constitution of the Commonwealth." 242 Va. at 361-62, 411 S.E.2d at 3.

A challenge was made that this arrangement violated the prohibition against long-term debt in the Virginia Constitution, which required that such debt be submitted for approval of the voters. The Virginia Supreme Court initially recognized this contract escape clause, but focused on its practical effect:

"Although the contract permits the county to discontinue its promised appropriations, we must also consider the practical effect of such a calamitous event in deciding whether the county in fact would be bound to continue to service the bond issue and, therefore, has incurred a 'debt' proscribed by Article VII, § 10(b). The county recognizes the importance of its fiscal integrity....

"The county also recognizes the disastrous effect that would follow any failure by the board of supervisors to make an annual appropriation and the county argues that such a disaster would never be permitted to occur. That argument implicitly acknowledges that the bond issue would have the practical effect of a long-term debt binding the county.

\*     \*     \*     \*     \*     \*

"  ... It is obviously contemplated that the issuance of the bonds in accordance with the contract would bind future boards of supervisors to make annual appropriations of sufficient funds to finance the bonds. Manifestly, the animating purpose of the bond contract arrangement is to create a long-term debt, without submitting the debt to a vote of the qualified voters of Fairfax County." 242 Va. at 364-65, 411 S.E.2d at 4-5.

However, the court granted a rehearing and, by a 4-3 margin, the court reversed its opinion and held the bonds to be constitutional. It came to this conclusion: "[W]e hold that Art. VII, § 10(b) is not applicable here because no constitutional debt was incurred by the County[.]" 242 Va. at 368, 411 S.E.2d at 10. This reversal was based on the premise that financial documents did not "impose a *legally* enforceable obligation on the County to appropriate the funds or to repay the bonds." 242 Va. at 368, 411 S.E.2d at 9. (Emphasis in original).

Much the same result was reached in *Steup v. Indiana Housing Finance Authority*, 273 Ind. 72, 402 N.E.2d 1215 (1980), where, in the revenue bond statute itself, there was language to the effect that the bonds were not an obligation of the state nor was there any obligation on the part of the legislature to fund the liquidation of the bonds. It was admitted that revenue to retire the bonds was to come from legislative appropriations, but the court stated:

"[T]he legislature *may* appropriate funds to the capital reserve fund. However, no funds can flow into the reserve fund unless and until there is an appropriation by the legislature. The Act allows but does not require such appropriations." 273 Ind. at 78, 402 N.E.2d at 1219. (Emphasis in original).

We simply cannot agree with the rationale of the Virginia and Indiana courts as we find it too chimerical. Obviously, where the only source of funds for revenue bonds is general appropriations, it defies logic to say that the Legislature has no obligation to fund such bonds. These courts are willing to ignore the practical reality that will be visited upon a state's credit if there is a default on the bonds. What these courts have done is to ignore the plain language and practical effect of the bond legislation.

We find a more rational and logical approach in *State ex rel. Ohio Funds Management Board v. Walker*, 55 Ohio St.3d 1, 561 N.E.2d 927 (1990). There the Ohio legislature created the Ohio Funds Management Board and authorized the Treasurer to issue revenue anticipation notes. Under the legislation, the notes were de-

clared not to be a debt or bonded indebtedness of the state. Moreover, the notes carried this disclaimer: " '[T]hey do not * * * represent or constitute a debt or bonded indebtedness of the state within the meaning of any provision of the Ohio Constitution [ .... ] The holders or owners of notes shall not be given the right, and have no right, to have excises or taxes levied by the state for the purpose of paying note service charges * * *.' " 55 Ohio St.3d at 8, 561 N.E.2d at 933.

The Supreme Court of Ohio began its analysis by stating: "[W]e must look to both the plain language and practical effect of [the statute]. This court must examine a transaction not only for what it purports to be, but what it actually is." 55 Ohio St.3d at 7, 561 N.E.2d at 932. (Citation omitted). The court then proceeded to analyze the various sections of the applicable legislation. It found that the notes authorized payments from the general revenue fund " 'to pay principal, interest, and premium, if any, payable on notes issued ... and for paying financing costs and costs for ... services ... to the extent not paid from note proceeds.' " 55 Ohio St.3d at 8, 561 N.E.2d at 933. (Citation omitted).

Moreover, the court found that there was statutory authority "granted to the noteholders to require the Treasurer to deposit sufficient tax revenues into the Note Service Fund to pay the notes[.]" 55 Ohio St.3d at 8, 561 N.E.2d at 933. Based on these provisions, the Supreme Court of Ohio concluded that its constitutional debt limit was violated.[24]

When we analyze the School Building Authority Act, W.Va.Code, 18–9D–1, et seq., we find a pattern similar to the Ohio

legislation. W.Va.Code, 18–9D–6, creates in the "state treasury a school building capital improvements fund to be expended by the authority for the purposes of this article." This same section authorizes the SBA "to pledge all or such part of the revenues paid into the school building capital improvements fund as may be needed to meet the requirements of any revenue bond issue or issues authorized by this article ... and in any trust agreement made in connection therewith[.]"

W.Va.Code, 18–9D–8, relates to the issuance of the bonds and requires them to be signed by the governor and by the president or vice-president of the SBA "under the great seal of the state, attested by the secretary of state[.]" It goes on to require:

"Any pledge of revenues for such revenue bonds made by the school building authority shall be valid and binding between the parties from the time the pledge is made; and the revenues so pledged shall immediately be subject to the lien of such pledge without any further physical delivery thereof or further act."

The right of the SBA to enter into trust agreements for bondholders is contained in W.Va.Code, 18–9D–12. In the following section, W.Va.Code, 18–9D–13, a sinking fund is created "in an amount sufficient to meet the requirements of any issue of bonds sold under the provisions of this article, as may be specified in the resolution of the authority authorizing the issue thereof and in any trust agreement entered into in connection therewith." Finally, we observe that while W.Va.Code, 18–9D–14, provides that the SBA cannot pledge the credit or taxing power of the State, and

---

**24.** The particular constitutional provisions set out by the court in State ex rel. Ohio Funds Management Board v. Walker, 55 Ohio St.3d at 4, 561 N.E.2d at 930, were:

"Section 1 of Article VIII provides:

" 'The state may contract debts, to supply casual deficits or failures in revenues, or to meet expenses not otherwise provided for; but the aggregate amount of such debts, direct and contingent, whether contracted by virtue of one or more acts of the general assembly, or at different periods of time, shall never

exceed seven hundred and fifty thousand dollars; and the money, arising from the creation of such debts, shall be applied to the purpose for which it was obtained, or to repay the debts so contracted, and to no other purpose whatever.'

"Section 3 of Article VIII provides:

" 'Except the debts above specified in sections one and two of this article, no debt whatever shall hereafter be created by, or on behalf of the state.' "

that the SBA's obligations are not "deemed to be obligations of the state," [25] it does not contain any language to the effect that the Legislature is not obligated to fund the bonds.

From the foregoing provisions, it would be difficult to conclude that the revenue bonds issued by the SBA are not obligations of the State. Certainly, the requirement of maintaining the sinking fund in order to service the bonds and provide for their redemption indicates a financial commitment by the Legislature. The same is true with respect to the pledge of the fund for the benefit of the bondholders.

Moreover, in 1992, Section 17 was added to Article 9D of Chapter 18. It directs that unencumbered interest in an amount of One Million Dollars ($1,000,000) held by any bank acting as trustee be transferred to the State's general revenue fund. This section goes on to explain:

"The purpose of the transfer of funds required by this section is to facilitate the appropriation of a like amount to the school building capital improvements fund, within the state budget for the fiscal year commencing on the first day of July, one thousand nine hundred nine-ty-two, to be used as debt service for revenue bonds to be issued by the authority pursuant to the provisions of section eight [§ 18–9D–8] of this article to finance needs projects to be selected by the authority which have not heretofore been funded because of the unavailability of necessary funding, and to pay the costs and reserves of such bond issues."

Here again we see a positive commitment on the part of the Legislature to pay the debt on the bonds.

Finally, unless we are to abandon our logic and common sense, we cannot help but conclude that the statutory scheme surrounding these bonds bespeaks a legislative requirement that they be funded. Much the same conclusion was reached by the Ohio Supreme Court in *State ex rel. Ohio Funds Management Board v. Walker, supra.* Even if we were to close our eyes to this statutory language, we could not close our minds to the practical consequences of this revenue arrangement. To accept the premise that the Legislature is not bound to fund the bonds and would allow a default, thereby impairing the credit rating of the State, assumes a naivete on our part that we simply do not possess.[26]

**25.** The complete text of W.Va.Code, 18–9D–14, is stated herein at 189 W.Va. at 752, 434 S.E.2d at 424.

**26.** It is particularly true in view of the fact that if we exclude the bonds issued by constitutional amendments, the SBA's new revenue bonds would constitute almost 15 percent of the State's other bonded indebtedness. The following information is from page 3 of the Analysis of Receipts and Expenditures for fiscal year 1991–92 issued by the Auditor of the State of West Virginia:

"STATE OF WEST VIRGINIA
STATEMENT OF BONDS OUTSTANDING
JUNE 30, 1992
SUMMARY OF BONDED INDEBTEDNESS
GENERAL OBLIGATION BONDS

DEPARTMENT OF HIGHWAYS:

| | |
|---|---:|
| 1964 AMENDMENT | $ 22,400,000 |
| 1968 AMENDMENT | 68,400,000 |
| 1973 AMENDMENT | 208,000,000 |
| TOTAL—DEPARTMENT OF HIGHWAYS | $ 298,800,000 |
| BETTER SCHOOL BUILDING BONDS | 74,000,000 |
| TOTAL—GENERAL OBLIGATION BONDS | $ 372,800,000 |

OTHER DEBT

| | |
|---|---:|
| TOLL BRIDGES | 8,730,000 |
| STATE BUILDING COMMISSION | 4,795,000 |
| STATE ARMORY BOARD | 30,000 |
| HIGHER EDUCATION | 187,381,000 |

Accordingly, we hold that the revenue bonds authorized under the School Building Authority Act constitute an indebtedness of the State in violation of Section 4 of Article X of the West Virginia Constitution. To the extent that Syllabus Point 3 of *State ex rel. Resource Recovery–Solid Waste Disposal Authority v. Gill, supra,* holds to the contrary, it is overruled. However, for the reasons assigned in the next sections, we decline to make this decision retroactive so as to invalidate the bonds earlier issued. Nor do we foreclose the SBA from exercising its right under W.Va.Code, 18–9D–9, to issue refunding bonds on the earlier issued bonds in order to secure a more favorable interest rate and, thereby, save state funds.

## III.

In a number of cases, we have discussed whether the principles of a given opinion should be extended retroactively so as to be applicable to past events. In this case, we are aware that the SBA already has issued revenue bonds and that the funds from those bonds not only were used to complete new schools, but also, in a number of instances, were used to fund construction already underway or authorized although not yet actually started.

It is apparent that voiding these bonds would bring considerable financial chaos to the State. Not only would it be damaging to the school system and the construction that is taking place, but it would place an enormous financial hardship on the State and ultimately the citizens as taxpayers. Our test for determining whether to make a court decision retroactive was recently stated in Syllabus Point 4 of *Kincaid v. Mangum,* 189 W.Va. 404, 432 S.E.2d 74 (1993):

" 'In determining whether to extend full retroactivity, the following factors are to be considered: First, the nature of the substantive issue overruled must be determined. If the issue involves a traditionally settled area of law, such as contracts or property as distinguished from torts, and the new rule was not clearly foreshadowed, then retroactivity is less justified. Second, where the overruled decision deals with procedural law rather than substantive, retroactivity ordinarily will be more readily accorded. Third, common law decisions, when overruled, may result in the overruling decision being given retroactive effect, since the substantive issue usually has a narrower impact and is likely to involve fewer parties. Fourth, where, on the other hand, substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored. Fifth, the more radically the new decision departs from previous substantive law, the greater the need for limiting retroactivity. Finally, this Court will also look to the precedent of other courts which have determined the retroactive/prospective question in the same area of the law in their overruling decisions.' Syl. pt. 5,

| | |
|---|---|
| PARK DEVELOPMENT | 5,129,427 |
| HOSPITAL FINANCE AUTHORITY | 354,165,450 |
| WEST VIRGINIA UNIVERSITY | 26,720,000 |
| SCHOOL BUILDING AUTHORITY | 331,040,000 |
| WV PARKWAY AUTHORITY | 135,439,530 |
| SOLID WASTE MANAGEMENT AUTHORITY | 9,645,000 |
| WATER DEVELOPMENT AUTHORITY | 155,350,000 |
| PUBLIC ENERGY AUTHORITY | 129,000,000 |
| REGIONAL JAIL AUTHORITY | 118,694,767 |
| HOUSING DEVELOPMENT AUTHORITY | 838,564,117 |
| OTHER—LEASE PURCHASES, MORTGAGES, NOTES, INSTALLMENT PURCHASES | 90,287,112 |
| TOTAL—OTHER DEBT | $2,394,971,403 |
| TOTAL | $2,767,771,403 |

*Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879 (1979)."

*See also* Syl. pt. 2, *Devrnja v. West Virginia Bd. of Medicine*, 185 W.Va. 594, 408 S.E.2d 346 (1991); *Geibel v. Clark*, 185 W.Va. 505, 510, 408 S.E.2d 84, 89 (1991); Syl. pt. 2, *Ashland Oil, Inc. v. Rose*, 177 W.Va. 20, 350 S.E.2d 531 (1986); *Daily Gazette Co., Inc. v. Committee on Legal Ethics*, 176 W.Va. 550, 551–52, 346 S.E.2d 341, 342–43 (1985); *Bond v. City of Huntington*, 166 W.Va. 581, 600, 276 S.E.2d 539, 549 (1981); Syl. pt. 3, *Ables v. Mooney*, 164 W.Va. 19, 264 S.E.2d 424 (1979).

■ While our bond law has been relatively certain as to constitutional limitations, we are willing to accept the assertion that Syllabus Point 3 of *Gill* may have been misconstrued to authorize the revenue bonds issued by the SBA. To this extent, *Gill* may be claimed to have unsettled our constitutional law on bonds, at least to the extent that today's opinion could be said to have been unanticipated. Thus, the first two elements of our test would not favor retroactivity.

The third and fourth retroactivity considerations bear on the impact of the new decision. We have no doubt that today's opinion will substantially limit the SBA's ability to issue future revenue bonds. Also, to the extent that we have limited *Gill,* it may be said that a departure is created from Syllabus Point 3. Finally, we observe that the United States Supreme Court, in several of its cases where it found state bonds to be unconstitutional from a federal standpoint because of voter restrictions, refused to make the decisions retroactive and to strike down earlier bonds that contained the same constitutional infirmity. *See, e.g., Hill v. Stone*, 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975); *City of Phoenix v. Kolodziejski*, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969).

Thus, based upon our general principles of retroactivity of judicial decisions, we conclude that revenue bonds issued by the SBA pursuant to W.Va.Code, 18–9D–1, *et* *seq.*, prior to the date of this opinion are not invalid.

## IV.

■ We also understand from the record that under the present bond issue, it is contemplated that some of the earlier issued revenue bonds are to be refunded. The right to refund these earlier bonds is specifically authorized under W.Va.Code, 18–9D–9, which states generally:

> "The issuance of revenue refunding bonds under the provisions of this article shall be authorized by resolution of the school building authority and shall otherwise be subject to the limitations, conditions and provisions of other revenue bonds under this article."

Allowing for the right to utilize refunding bonds is a common practice. It is designed for several purposes, one of which is to enable the bond issuing authority to obtain the advantage of lower interest rates through the use of refunding bonds. Refunding the bonds saves on the cost of liquidating the older bonds, which is the avowed purpose for part of the 1993 Series bonds. Other courts have recognized that this is a valid purpose for utilizing refunding bonds. *See, e.g., Beaumont v. Faubus,* 239 Ark. 801, 394 S.W.2d 478 (1965); *State v. City of Miami*, 155 Fla. 180, 19 So.2d 790 (1944); *State Highway Comm'n of Ky. v. King*, 259 Ky. 414, 82 S.W.2d 443 (1935); *State ex rel. Maestri v. Cave*, 193 La. 419, 190 So. 631 (1939); *People ex rel. City of Rock Island v. Rudgren*, 378 Ill. 408, 38 N.E.2d 723 (1941). *See generally* Annot., *Power of Governmental Unit to Issue Bonds as Implying Power to Refund Them*, 1 A.L.R.2d 134 (1948).

In *Board of Education of the County of Hancock v. Slack*, 174 W.Va. 437, 445, 327 S.E.2d 416, 425 (1985), we discussed the concept of refunding bonds and stated: "There is no question that the majority of jurisdictions still hold that refunding bonds do not create a new indebtedness." (Citations omitted). We find no present violation of Section 4 of Article X in issuing part of the 1993 Series bonds for this purpose

because no new debt is created through refunding the bonds.

Consequently, we determine that the previous issue of SBA bonds is not invalid under principles of retroactivity, and, because we also have determined that the refunding of bonds does not create new debt, the SBA is authorized to issue refunding bonds from the new 1993 series bonds to replace existing bonds at a lower interest rate.[27]

## V.

In closing, we wish to reemphasize what we stated earlier: No prudent bond counsel reading the specific financial arrangements outlined in *Gill* could have believed that it would authorize the revenue bonds at issue in this case. We are amazed that no attempt was made before the original issue of the SBA bonds to obtain an opinion as to their validity from the Attorney General. Moreover, in view of the amount involved and the purpose of the bonds, prudence would have dictated that a court determination should have been sought as to their legality. We cannot help but echo the admonition of this Court given more than twenty years ago in *Hall v. Taylor*, 154 W.Va. at 677, 178 S.E.2d at 59:

> "If by this decision this state may be embarrassed financially, it is not the fault of this Court. The parties knew or

should have known that this was a questionable procedure, and the matter of the validity of these bonds and the question of whether they were general obligation bonds or revenue bonds [28] could have been tested in a proper proceeding in a court of competent jurisdiction before the Building Commission proceeded to the point where admittedly chaos may result because of the decision of this Court in this case."

We, therefore, conclude for the foregoing reasons that the judgment of the Circuit Court of Kanawha County should be affirmed.[29]

Affirmed.

NEELY, J., concurs and reserves the right to file a concurring opinion.

NEELY, Justice, concurring:

I concur separately because, as Justice John Marshall once said, "... we must never forget that it is a constitution we are expounding." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407, 4 L.Ed. 579 (1819). The twenty years I have been on the court have seen numerous bond cases. What instructed our understanding of these cases was the spirit as well as the exact text of our *Constitution*.

Our constitutional framers well understood that political leaders become wildly popular by spending money and wildly un-

---

**27.** We are advised that of the $338,145,000 of new revenue bonds that are the subject of this suit, approximately $154,000,000 of the new bonds will be used to refund the earlier bonds at a reduced interest rate once the applicable estimated debt service revenue and the cost of issuing the bonds are taken out. The net amount left for new projects is estimated at $160,000,000. Thus, this opinion will not invalidate almost 50 percent of the proposed new bonds which will be used to refund the previously issued bonds.

**28.** We have purposely declined to attempt to distinguish between general obligation and revenue bonds in this opinion. These terms are not used in Sections 4 or 6 or Article X. The critical issue is not their names, but whether the bonds create an impermissible indebtedness against the State.

**29.** We would point out that the Circuit Court of Kanawha County addressed neither the question of retroactivity nor the question of the validity

of refunding the bonds. Consequently, its opinion order has no applicability to these two issues. Moreover, we also point out that although not at issue herein, there is general authority that precludes citizens and taxpayers from attacking the validity of a bond issue where the bonds were sold to third parties and the bond funds were partially utilized. Such authority is based upon the doctrine of laches. *See, e.g., Solomon v. North Shore Sanitary Dist.*, 48 Ill.2d 309, 269 N.E.2d 457 (1971); *Drenning v. Bd. of Comm'rs of City of Topeka*, 148 Kan. 366, 81 P.2d 720 (1938); *Zeitler v. Town of Hinsdale*, 5 Mass.App. 778, 359 N.E.2d 1315 (1977); *New York Public Interest Research Group, Inc. v. Levitt*, 62 A.D.2d 1074, 404 N.Y.S.2d 55 (1978); *Ciletti v. City of Washington*, 392 Pa. 204, 140 A.2d 98 (1958). *Cf. Maynard v. Board of Educ. of Wayne County*, 178 W.Va. 53, 357 S.E.2d 246 (1987). *See generally* 64 Am.Jur.2d *Public Securities and Obligations* § 478 (1972).

popular by taxing. Thus, political leaders, if left to their own devices, will inevitably reward supporters with jobs, contracts and public works without raising taxes whenever possible. This, of course, can usually be done only by borrowing money that future generations must repay.

American electoral democracy has two components—voter numerosity and voter intensity. Although taxpayers are numerous, they are not intense. It is the *providers* of government services who are intense, because their entire livelihoods depend on government largesse. Provider intensity translates directly into political campaign contributions, organized election day support and constant badgering from the providers' influential lobbyists.

Counter-intuitive as it may seem, the means invariably overwhelm the ends in the world of practical politics.[1] Political battlefields are perennially littered with the mangled corpses of officials who believed government could be run like a business.

But government and business run on completely different principles: business thrives on efficiency; government thrives on patronage. Business always lowers costs as a means to an end, while in government the means *are* the end. That's why the back-slapping, log-rolling, pork-barrelling, job-giving, vote-buying and deal-making M.M. Neelys, Dick Daleys (senior) and Alfonse D'Amatos of this world are so wildly successful in politics, while the narrow, clean-cut, honest, technocratic, humorless Michael Dukakises, Jerry Browns and Richard Lamms are such stupendous failures.[2]

None of politics' exotic considerations come into play in private business where most voters dwell. When a person sells swimming pool cleaner, for example, he doesn't worry about things like inherited political party preference or low primary election voter turn out. No customer boycotts Brand X pool cleaner because Mrs. X looks like an unmade bed or hires illegal

1. The example I like best of how the means in politics overwhelm the ends comes from the Hundred Years' War between England and France. In the Hundred Years' War the overwhelming of ends by means guaranteed that France would be raped, looted and burned for five generations by numerically inferior English forces operating at the end of a very long and precarious logistical line. Right from the beginning the smart money said that the French should beat the daylights out of the English, but that wasn't what happened because the smart money didn't understand the French aristocracy's obsession with its own "provider" status.

There were three great battles of the Hundred Years' War—Crécy (1346), Poitiers (1356) and Agincourt (1415). In all three of these battles the English stomped the French through the use of tactics that the French could easily have overcome. At Crécy, 7,000 English archers routed a much larger French force that included more than 1,000 armor-clad knights. And nearly seventy years later, at Agincourt, a mere 13,000 English soldiers armed with longbows and pikes defeated a French force of about 50,000!

The English won consistently because the French armies of the fourteenth and fifteenth centuries relied primarily on heavily armored knights to terrify the opposition's untrained peasant infantry, break its ranks, and then hack it to death with heavy swords and axes. But the English infantry was not like the French infantry: the English infantry was composed of well trained, professional soldiers skilled in the use

of the famous English long bow (which had a much longer effective range than the French crossbow and fired at least five times as many arrows per minute.) The English infantry, unlike its French counterpart, knew how to withstand a charge by armored knights.

Unfortunately for the ordinary Frenchman of the Hundred Years' War period, explicit recognition of the superiority of English infantry over armored knights would have destroyed the French aristocracy's *raison d'etre* and shifted the center of military (and therefore political) power away from the landed, equestrian class to a cadre of professional *infantry* officers. If the goal of the French élite had been simply to field winning armies, then both Poitiers and Agincourt would have been decisive French victories. However, that was not the goal: The goal of the French élite was to maintain the social and political *status quo* within French chivalry.

2. I am trying to explain these matters in simple, common sense terms, but both Kenneth Arrow and James Buchanan have won separate Nobel Prizes for their work in "public choice theory." Public choice theory, as a sub-specialty of economics, involves the construction of complex mathematical models to explain behavior that anyone who has ever been elected county commissioner or sheriff understands intuitively. *See, e.g.,* Kenneth Arrow, *Social Choices and Individual Values,* John Wiley & Sons (New York, 1951); James Buchanan, *Essays on the Political Economy,* University of Hawaii Press (Honolulu, 1989.)

aliens, nor does he boycott because Mr. X isn't black or a woman or more actively against abortion. Most importantly, no customer's purchase of Brand X pool cleaner depends upon some cockamamie formula by which one customer gets pool cleaner free while another customer pays three times the market price.

Government, however, does have a cockamamie scheme whereby some customers get goods free while others pay three times the market price. The big difference between government and business, then, is that in business every customer must purchase his own goods and services with his own money, while in government a customer quite possibly may obtain a valuable good or service and have somebody else pay for it. In government, the sale of bonds without a constitutional amendment or dedicated revenue source is the ultimate shell game; under that scheme, even those who actually *will* pay are more or less led to believe that the goods are free. Such a mechanism, therefore, is exactly what *W. Va. Const.* art. X, § 4 prohibits.

Notwithstanding all of the free-market rhetoric of the Reagan era, the longest peacetime boom in recorded history (1982–1990) was fueled by the largest peacetime deficit in recorded history, much of which went into a massive defense build-up. Instead of the old Roosevelt "tax tax, spend spend, elect and elect," the stolid Republicans of the 1980s improved upon the New Deal vote buying formula with "borrow borrow, spend spend, elect and elect." This worked for quite awhile, but only because Reaganomics was really Keynes as restated by Kafka. Now, however, having stretched ourselves to the breaking point, only big tax hikes will give us more government programs. Roughly six percent of our gross national product (*not* our federal budget) is devoted exclusively to paying the *interest* on the national debt.

States and cities are now approaching the same funding problems that vex the federal government, but with two notable differences: States and cities cannot print money or borrow for decades without repayment with near impunity. In fiscal year 1992–93, California had over a $14 billion budget gap, the budget gap of the state of New York exceeded $6 billion, and most other state governments—including Illinois, Pennsylvania, Massachusetts and Maryland—experienced serious financial problems.

Indeed, failure to exert responsible controls on borrowing may be the downfall of New York City. Between 1989 and 1992 debt service payments rose faster than any other major expense, growing by 47.7 percent after adjusting for inflation, versus only 9.2 percent in the preceding three years. Debt service accounted for three-fourths of the net real increase in city spending between 1989 and 1992. This recent growth occurred because the city deferred interest payments by refinancing debt during the 1980s.[3] This brought debt service costs down momentarily: They consumed 11.0 percent of the general fund in 1983, versus only 6.3 percent in 1990. But the bill is coming due today, just as the city

---

**3.** One of the leading cases cited by the Trustee, United National Bank, in support of the bonds at issue in this case is *Schulz v. State*, 151 Misc.2d 594, 582 N.Y.S.2d 355 (trial court 1992). This case shows courts acquiescing in the exact antithesis of good government. The bonds in *Schulz* were "to fund local assistance payments for elementary and secondary education, community college aid and tuition assistance programs, payments of non-Federal share of local Medicaid costs and other local assistance programs, including revenue sharing assistance, and for health and the improvement of environmental quality, housing initiatives, mental health and drug abuse programs, mass transportation and highway and bridge programs." 582 N.Y.S.2d at 356–57. Although the public benefit corporation that issued the bonds lacked taxing authority and the bonds were primarily secured by a one percent sales tax, subject to annual appropriation by the state, the court found that the bonds did not violate the New York *Constitution*'s prohibition against state and political subdivision debt without voter approval. The money involved in the bonds was of "astronomical proportions—a total of $4.7 billion bonds ultimately to be issued: approximately $2.4 billion already issued; and approximately $450 million to be issued" upon the court's decision. 582 N.Y.S.2d at 362. The bill for borrowing to fund basic governmental service is also astronomical.

is experiencing severe recession.[4] The wisdom of our West Virginia constitutional framers, then, appears to be timeless. We must profit from the mistakes of others like New York City who failed to discipline themselves.

"Budget gaps" are not "deficits." Through a combination of cuts in services and blue smoke and mirrors, California and New York theoretically spent no more than they took in. But, in order to prevent the "budget gaps" from becoming "deficits" the governments cut important existing services. The budgets for police protection, fire protection, road maintenance, and other traditional, desirable, valuable local government services have been reduced to prevent the state governments from running actual deficits. Given the limited potential for states significantly to increase their revenues in the near future, the decision of which services are provided by the states has increasingly become a zero-sum game. Debt today, then, leads directly to cuts in services tomorrow.[5]

*W. Va. Const.* art. X, §§ 4 and 6, are designed to prevent one generation of politicians from helping their friends whilst leaving the next generation of taxpayers to foot the bill. Any given project that effectively bestows government benefits today and postpones taxpayer pain until tomorrow is prohibited by *W. Va. Const.* art. X, §§ 4 and 6, unless the voters approve the project with a constitutional amendment. That is what explains the results in the cases duly cited and discussed by the majority.

Among the instances where we have allowed bonds to be issued without voter approval, the easiest cases to explain are the real "revenue bond" cases where bond proceeds were to be used to build projects like toll bridges, the West Virginia Turnpike or state college buildings.[6] In these cases, the projects generate cash revenue from third parties. The government revenue bond scheme is simply a straight-up business deal involving government in its proprietary capacity: Lenders conclude that the income from the project will be sufficient to cover repayment of interest and principle; when lenders are wrong, lenders, not taxpayers, take a bath.

Then, there are the quasi-revenue bond cases where the government agrees to pay rent on a new building that is technically owned by the bondholders.[7] Well, the security for the bondholders is the building,

---

4. *See, City Journal,* Vol. 3, Number 2 (Spring, 1993) p. 27.

5. California has moved to tap user fees and property taxes to pay for services that were once funded by the state general fund. California increased the proportion of property taxes used to fund public schools, thus reducing the remaining money available to localities to fund police, fire protection, pothole filling and other services provided by localities. National Governor's Association, *The Fiscal Survey of States: April 1993,* p. 17.

   To make up for the cuts in the higher education budget, tuition and fees at public institutions have been raised significantly. The University of California and California State University systems nearly doubled their tuitions between 1991 and 1993, while the California community colleges tripled their tuition during that same period. California Legislative Analyst, *State Spending Plan for 1992* (Nov. 1992). The University of California System, a system that used to pride itself on providing low-cost quality college education is increasingly shedding that low-cost image (as well, perhaps, as some of the quality).

6. *See State ex rel. State Road Commission v. O'Brien,* 140 W.Va. 114, 116, 82 S.E.2d 903, 904

(1954) (principal and interest to be paid "out of the revenues to be derived from the operation of the bridge"); *Guaranty Trust Co. of N.Y. v. West Virginia Turnpike Commission,* 144 W.Va. 266, 269, 107 S.E.2d 792, 795 (1959) ("the tolls and other revenues received from time to time by the Commission" are pledged or assigned "to secure the payment of such bonds"); *State ex rel. Board of Governors of West Virginia University v. O'Brien,* 142 W.Va. 88, 90, 94 S.E.2d 446, 447 (1956) ("principal of and interest on such bonds shall be payable solely from the special non-revolving fund" in which are deposited "all fees collect ... from students at the university other than students in" specified schools).

7. *See State ex rel. State Building Commission v. Moore,* 155 W.Va. 212, 217, 184 S.E.2d 94, 98 (1971) (rents for state buildings are pledged to secure the bonds that are to be paid from a special fund into which "an annual payment of $3,600,000 [is] to be made by the West Virginia Alcohol Beverage Control Commissioner from profits accruing from the sale of alcoholic liquors pursuant to statutes which create a state monopoly for the sale thereof").

and if the government can find cheaper alternative facilities, the government is technically entitled to depart, leaving the bondholders holding the bag. However, the distinction between what the bondholder's security is—building *versus* general credit—is not really the most important distinction. The important distinction is that in office building cases there is a measurable need that can be met efficiently and cheaply through the issuance of quasi-revenue bonds. Furthermore, office buildings, unlike schools, have a non-governmental use and can be rented to non-government tenants although, perhaps, at a loss.

The same can be said for the power generating plant at West Virginia University; this plant was designed to earn a fair market return from the outset.[8] The plant had a narrow purpose and the scheme's economic viability was never any more in doubt than the best laid plans of successful private corporations.

School bonds, on the other hand, are for the purpose of building structures whose *revenue* returns are nonexistent. While thousands of jobs and millions of dollars in contractor profits will emerge from school construction, there appears to be little correlation between the quality of school *buildings* and the achievement level of students leaving the system. The big correlations in education are between school success on the one hand and the student's family structure, the student's parents' social class[9], and student's parents' educational level on the other.[10] Both our current high rate of divorce[11] and our rapidly rising rate of illegitimate births have the effect of ratcheting down the social class of the households in which a larger and larger percentage of our school-aged children live. The following chart prepared by the Centers for Disease Control presents the point clearly.

8. *See State ex rel. West Virginia Resource Recovery–Solid Waste Disposal Authority v. Gill,* 174 W.Va. 109, 110, 323 S.E.2d 590, 591 (1984) ("[t]he board would buy steam for the university, and revenues received from those steam sales would retire the bonds and pay plant operation and maintenance costs").

9. By 1962, sociologists like Patricia Cayo Sexton of New York University were pointing out that the most prominent correlation between a child's success in life and other factors is between success in life and the social class of the child's parents. *See,* Patricia Cayo Sexton, *Edu-*

*cation and Income,* Viking Press (New York, 1961).

10. *See,* John E. Chubb and Terry M. Moe, *Politics, Markets & American Colleges,* The Brookings Institution, Washington, D.C., 1990, pp. 105–111.

11. In 1990, there were 1,175,000 divorces granted in the United States. Divorce rates are calculated as number of divorces per 1,000 population; in 1990, the national divorce rate was 4.7. Table 134, *Statistical Abstract of the United States,* 1992.

**Percent of children 5-17 years of age who had ever experienced selected academic problems, by family type: United States, 1988**

The child of a never-married mother is roughly three times more likely to be expelled from school than the child of a two-parent family and the child of a never-married mother is almost three times more likely than the child of a two-parent family to repeat a grade.[12] The sequence of divorce followed by a succession of boy or girlfriends, a second marriage, and frequently another divorce and another turnover of partners produces a totally disrupted life for a child which makes any educational endeavor entirely problematic.

States that spend more per pupil in the public schools do not generally have any better educational performance to show for it. The correlation between financial inputs and educational outputs is nearly nonexistent because any positive contribution

12. Source: U.S. Dept. of Health and Human Services, Public Health Service, Centers for Disease Control, National Center for Health Statistics, Hyattsville, Maryland, June, 1991, DHHS Publication Number (PHS) 91-1506.

to educational performance that emanates from improved facilities, better teachers, or superior equipment is more than offset by our meteorically rising rates of illegitimacy, divorce and parental neglect. In Clay County, West Virginia the black population is one-tenth of one percent while the illegitimacy rate is 29.5 percent. *White* illegitimacy alone in the United States today exceeds 19 percent.[13]

Connecticut spent more than $4,000 per pupil in 1984 but student test scores were lower than those in Vermont, which spent just under $3,000 per pupil. Rhode Island also spent close to $4,000 per pupil and had the lowest average test scores of the three. New York state which spent more than $5,000 per pupil that year, finished just barely ahead of Rhode Island and significantly behind Vermont.[14] There are, of course, cases where high expenditures correlate perfectly with high academic performance as in our great private preparatory schools like Groton, St. Paul's and Taft or upper-middle-class public schools like Greenwich High School and Bethesda–Chevy Chase. More affluent communities and more affluent parents, however, are typically of higher social class, less likely to be divorced and better-educated. When *parents* emphasize education to their children, the children do well.

The consistently poor performance of American grade school, middle school and high school students *vis à vis* the same students from European and Pacific Rim countries demonstrates that we are doing something very wrong in the schooling process between the first and twelfth grades. However, what we are doing wrong has nothing to do with the amount of money we are willing to spend. Objective criteria like funding levels, construction budgets, and teacher competency, demonstrate that we are highly committed to education and freely willing to pay for superior quality. So far, however, more money has not helped us a bit in comparison to societies that spend far less money but have far fewer family-related pathologies stemming from rampant illegitimacy and divorce.

My decidedly unpleasant conclusions are borne out by a comparison of America to our seeming economic nemesis, Japan. On standard tests of mathematical skills the United States ranks well below Japan, Korea, Taiwan and most of Western Europe.[15] Yet, the superior performance of students outside the United States is entirely unrelated to superior education systems, at least if education systems are measured by teacher credentials, teacher to student ratios, absolute expenditures per student, or education expenditures as percentages of Gross National Product.[16] The charts below compare Japanese and American education.[17] Western European countries that out-perform the United States spend slightly more per pupil than Japan while Pacific Rim countries (Korea and Taiwan) that out-

**13.** Table 87, *Statistical Abstract of the United States,* 1992. For every one illegitimate black birth, there are 1.3 illegitimate white births. In 1989, there were 593,900 illegitimate white births in the United States, and 457,500 illegitimate black births. In 1970, however, there were many more black illegitimate births than white illegitimate births: 215,100 to 175,100 or 1.23 black illegitimate births for every white illegitimate birth. In a mere twenty years, the situation has turned exactly around and the gap continues to grow. Consequently, contrary to popular belief, illegitimacy is not predominantly a black underclass inner-city problem. Today illegitimacy is a white, heartland America, middle class problem.

**14.** *See,* Thomas Sowell, *Inside American Education,* The Free Press (New York, 1993) p. 11.

**15.** *See,* A.E. Lapointe, N.A. Mead, and G.W. Phillips, *A World of Differences: An International Assessment of Mathematics and Science,* Educational Testing Service (Princeton, N.J., 1989); L. Comber and J. Keeves, *Science Achievement in Nineteen Countries,* John Wiley (New York, 1973).

**16.** Japan has the highest elementary and secondary school science and mathematics test scores in the world. However, Japan ranks below the United States, Canada, France, Netherlands, and Belgium in student:teacher ratios, quality of teachers, facilities, and class size. *See,* M. Howarth, *Britain's Educational Reform: A Comparison with Japan,* Nissan Institute/Routledge Japanese studies series, Routledge (New York, 1991).

**17.** The objection can be raised that Japan's superior performance *vis à vis* the United States has to do with our shorter school year. I don't believe there is much correlation, but even if a longer school year explained Japan's superiority over the U.S., it would not explain Japan's superiority over Western Europe, where the school year is about as long as in Japan.

perform the United States spend substantially less than Japan. Japanese students, however, out-perform everyone on standard tests, which is why I have chosen to compare us to the Japanese.

## JAPAN [18]

### EDUCATION

|  | Schools | Teachers | Students | Students per Teacher |
|---|---|---|---|---|
| Primary | 24,852 | 445,000 | 9,607,000 | 22 |
| Secondary | 16,774 | 570,000 | 11,265,000 | 20 |
| Third Level | 1,145 | 145,000 | 2,581,000 | 18 |

GNP for Education: 5.0%

Literacy Rate: 99%

## UNITED STATES OF AMERICA [19]

### EDUCATION

|  | Schools | Teachers | Students | Students per Teacher |
|---|---|---|---|---|
| Primary | 71,608 | 1,306,001 | 25,506,170 | 20 |
| Secondary | 29,442 | 977,079 | 14,786,138 | 15 |
| Third Level | 3,406 | 772,000 | 7,117,000 | 10 |

GNP for Education: 6.7%

Literacy Rate: 97%

---

Compared to the United States, the Japanese spend 25.4 percent less money as a proportion of their GNP on education, have a substantially higher student to teacher ratio, and send only 23 percent of their secondary students on to third level education as opposed to our 48 percent. Japanese primary school teachers, on average, have several years less formal education than American primary teachers; Japanese school buildings do not compare favorably with American school buildings; and many schools and classrooms in Japan are substantially more overcrowded than *average* class size would indicate. In the United States, in contrast, student to teacher ratios are set by law and enforced by teacher unions through the courts—a situation that would never exist in Japan.[20]

18. Source: *P.C. Globe, Inc.,* Tempe, AZ (1992).

19. *Ibid.*

20. Contrary to popular belief, Japan is *not* the powerhouse of efficiency that it is often believed to be. The Japanese have created a powerhouse in automobiles, semi-conductors, and consumer electronics, and they have exported those products around the world, but the Japanese do not encourage competition in the rest of their economy, so the rest of the Japanese economy has languished horribly and falls far behind its American counterparts. Indeed, American productivity is significantly higher than Japanese productivity: In 1990 each full time U.S. worker produced $49,600 in goods and services, compared to $38,200 for Japanese workers. And, Japanese productivity in such protected areas as general retailing was only 44 percent of that of U.S. workers. Japanese factory workers overall produced only about 80 percent as much as Americans on an hourly basis. Consequently, the Japanese are not the supermen and superwomen that the press often portrays, and contrary to popular belief, the Japanese do not have anywhere close to the most efficient way of doing business in the world—we do. *See, Service Sector Productivity,* McKinsey Global In-

The top end of American education—namely, college and graduate school education—is the best in world. That our problem lies in educating *children* rather than *adults* alone implies that our crisis in primary and secondary education is *fundamentally* a function of the students. The quality of our schools in comparison to the schools of other countries is roughly the same at all levels, but as soon as the American system is given motivated students (i.e., adults who *want* to be in class), America's performance skyrockets to stellar heights, leaving every other system in the world far below.

The first six grades of school are not only hard, but are also supremely boring. Learning to read, write, calculate and spell requires drill, drill, drill and more drill. Good teachers try to make this drill as much fun as possible, but nobody ever disguised school's tedious nature for me. Until the seventh grade (when school finally began to deal with ideas) I hated school as much as Huckleberry Finn did. My father hated school, my wife hated school, and now my son hates school. Indeed, among my friends it is hard to find someone who did not hate at least the "school" part of school, even if he or she enjoyed going to school for the social distraction.

School doesn't work very well without homework, yet children *uniformly* hate homework and even geniuses like Albert Einstein and Winston Churchill adamantly refused to do homework without coercion. Children commonly *can't* do their homework alone because they can't understand it. This is particularly true when reading skills have not developed to the point where children can grasp written directions. Parents, consequently, must *supervise* homework, which in most cases means actually *doing* the homework with (if not for) the child. As educators are now coming to appreciate, homework can be the most divisive element in family life. Overworked, indifferent or self-absorbed parents can't cope with the stress inherent in coaxing and coercing children to do homework, so grade schools, middle schools and high schools aren't nearly as successful as the money we pour into them would seem to warrant. Colleges and graduate schools, in contrast, are overwhelmingly successful because parental supervision is no longer the cynosure of student success.

A few years ago my editor at the Free Press was Grant Ujifusa, a Nisei Japanese from Wyoming who wears cowboy boots and went to Harvard. Grant told me about one of his sister's friends, a middle-aged woman who first came to the United States fifteen years ago with her husband, a prominent young Japanese executive. Living immediately outside New York City, the Japanese woman witnessed her Anglo women friends being abandoned by their husbands (who typically ran off with younger women), Anglo children being sent off to third rate boarding schools because dual career parents didn't have time to care for them at home, and Anglo women abandoning both husbands and children to run off with lovers. Commenting on what she had been seeing to Grant's sister, she asked rhetorically: "What are these people, animals?"

Thus, the prime fact of education that the Japanese well understand but most Americans ardently deny: Primary and secondary education depend about 60 percent on students and parents, and only about 40 percent on teachers and schools. Of course, when highly motivated students are combined with superior teachers, as they are in the great upper-middle class public schools or in the great private boarding schools, the results are spectacular. These spectacular results, however, are because of the *students*, not because of the teachers or schools. Seldom accepting candidates below the 50th percentile on the SSAT (the secondary school scholastic aptitude test), Groton, St. Paul's and Taft populate their schools with students having an ability rating well above the 95th percentile as compared to *all* children that age in the United States.

In the 1950s I went to a private school that had moved from Europe to the United States to escape the Nazis. The school was

stitute, McKinsey & Co., Inc. (Washington, D.C., 1992).

located on the old Winthrop estate in Lenox, Massachusetts, very close to the Boston Symphony Orchestra's Tanglewood property. Old Man Winthrop had loved exotic birds, so he had built a large structure in which to house his bird collection. The ceiling of this structure was higher than the ceiling of a traditional chicken coop, but lower than the ceiling of a house, and about every ten feet there was a little round door about fifteen inches high at ground level so the birds could go in and out. My school had converted this bird palace into what we called the "class house"—the building where our classes were held. The class house had a primitive heating system, and when the temperature went below zero, we all needed to wear our jackets inside. Steam emanated from the teachers' mouths as they lectured.

Although the Lenox public library was extraordinarily well-stocked, my school's library was a disaster and the dormitories would never have passed inspection if the place had been a state-operated school for juvenile delinquents. And while the campus was beautiful and the food better than average, the place was otherwise a dump. Nonetheless, the teachers knew their subjects and were surpassingly enthusiastic, so the school radiated with excitement for the arts, music, literature, politics and science. Enough students studied hard that peer pressure worked generally in a positive direction. The top half of my small graduating class had college board scores well over 1200, and it was a rare student who scored under 1000. Yet the facilities of this school would be officially condemned today in *any* public school district.

Good students perform two functions. They make it possible for the teachers to be enthusiastic and they inspire their classmates. The single most important element in a person's education is expectations; when a person is *expected* by his or her parents, teachers, and peers to do well, he or she usually does well. When parents and peers expect bad performance, the student performs badly.

The leading article on the effects of low expectations on minority children was written by Claude M. Steele, a sociologist at Stanford.[21] According to Professor Steele, more than half of black college students fail to complete their degree work for reasons that have little to do with innate ability or environmental conditioning. The problem, according to Professor Steele, is that black students from the outset of their school days are undervalued in malevolent, racist ways as well as in subtle, unconscious ways. Yet the class valedictorian of my own high school graduating class was a black student whose father was a professor of physics at Howard University. He went on to MIT, and thence became a high ranking executive at Ford Motor Company because that is what his family, his peers, and his school expected of him.

Most parents understand the power of peer pressure, but only a minority of parents understand the relationship between parental nurture and peer pressure. In general it is not true that children identify with their peers more than with their parents. When parents are actively involved in their children's lives and behave reasonably, children identify *primarily* with their parents. Thus, almost all children adopt both their parents' religion and their parents' political party affiliation. This is not to say that there isn't a constant battle for a child's soul between concerned parents and peers; it is only to say that most of the time *concerned* parents win handily.

None of this should be taken to imply that either I or any of the other judges of this court would not *vote* for a constitutional amendment to pass $338 million in school bonds; we would. Nonetheless, schools do not have the same direct revenue-producing ability a turnpike, college building for fee-paying students, power generating plant, or even a state or county office building have. Although the office buildings are, perhaps, the hardest cases to distinguish, what goes on in state and municipal offices is largely routine work that is important to the smooth functioning of the economy. Unlike schools, there is no political debate

21. "Race and the Schooling of Black Ameri-    cans," *The Atlantic,* April 1992.

about what a county clerk ought to do in filing deeds, liens, financing agreements, etc., and there is little debate about what circuit courts, circuit clerks, zoning boards, and assessors ought to do. Efficiency in the operation of these offices does, indeed, enhance a county's or city's economic performance and, most importantly, the cost to taxpayers of new facilities bought through a bond financing device may not be substantially higher than the cost of worker inefficiency, maintenance and repairs with continued use of old facilities.[22]

At a minimum, then, *W.Va. Const.* art. X, § 4 requires that bonds of any sort issued without a constitutional amendment be secured ONLY by the project the bonds are issued to build, and that there be a definitely ascertainable special revenue source from which the bonds are to be retired. That, at least, inspires lenders to inquire carefully into whether the project is built for a specific and measurably *profitable* end and whether the revenue source is adequate to retire the bonds.

However, as I have attempted to make clear in this concurrence, I do not believe that a cosmetic change of what amounts to general obligation school bonds to a lease purchase arrangement using a revenue bond format would permit the scheme to pass constitutional muster unless a new, fiscally sound, dedicated tax were enacted. In general, the bond-funded projects that have been approved without a constitutional amendment created measurable benefits that directly translated into earned or saved tax dollars. This cannot be said for schools by any stretch of the imagination. Borrowing money for consumption (like New York City) or to build projects that will give no tax dollar return is fiscal idiocy. For those projects, the voters must either approve the project at the polls or the legislature must muster the resolve immediately to enact a *new*, dedicated tax.

At the beginning of this opinion I discussed the plight of New York City because of the city's rapidly accelerating debt. One reason that borrowing has gotten out of hand there is that provider lobbies have successfully argued that such things as health care should be funded through the capital budget. All providers will always make the argument that health care, education, drug treatment facilities, shelters for run away children, etc. are actually "investments" in human capital. This may be true, but then again it may not be true. Certainly it doesn't *seem* to be true in education at this particular moment. Therefore, any time the credit of the State is even *implicitly* pledged, as it would be whenever a project has no measurable revenue-generating potential, the specter of means overwhelming ends becomes sufficiently prominent that the spirit of *W.Va. Const.* art. X, § 4 is confounded and the proposed project must be taken to the people.

Therefore, it seems to me that in order for a bond issue to survive *W.Va. Const.* art X, § 4 scrutiny, there are three criteria that must be met. First, the project must be reasonably calculated either to earn or save money, not enhance quality of life or increase some speculative "investment" in human capital. Second, the financing scheme must rely on a lease/purchase structure where the bonds are secured *only* by the project the bonds are issued to construct and not even implicitly by the credit of the State. And, third, there must be some special fund, preferably from third party payors, but also possibly a dedicated tax or portion of existing budgets (such as the portion for maintenance) that can be pledged to the retirement of the bonds. Thus, we have a situation analogous to a mathematical equation where $X \cdot Y \cdot Z = k$. If X is very large, then perhaps Y and Z can be a little smaller, and if Z is large, then perhaps X and Y can be a little smaller.

---

**22.** This latter cost consideration becomes particularly prominent with regard to prisons and jails when the specter of federal court litigation and federal court orders requiring jails and prisons to meet federal Eighth Amendment standards are added into the equation. See my concurring opinion in part II of which Justices Miller and Brotherton joined in *State ex rel. Dodrill v. Scott,* 177 W.Va. 452, 352 S.E.2d 741 (1986).

In all of this each branch of government has its place. It is the proper role of the governor to be forward-looking, imaginative, enthusiastic and optimistic. Similarly, it is the role of the legislature to make sure that if there is political pork, that pork will be equitably distributed. It is also the role of the legislature to temper the enthusiasm of the governor whenever his zeal threatens even narrow constituent interests, including the interest in lower taxes. (Thus the war cry of the priests and barons who composed the first legislatures in the 12th and 13th centuries: *"Nolumus leges anglicae mutare!"* [23])

Courts, with their long and secure tenure are the repository of society's collective memory. That, in many regards, is what a constitution is all about. Although it is not possible to say in advance what "special fund" schemes will qualify as outside the *W.Va. Const.* art. X, § 4 prohibition, what can be said is that when each scheme is evaluated on its merits, the history of other states' fiscal problems and the fiscal problems of the mother Commonwealth of Virginia at the time our *Constitution* was drafted will be what most forcefully instruct our understanding.

**23.** "Nolumus leges anglicae mutare" is traditionally translated "The laws of England will never change!"